No. 13-5315

# UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

————————————

RALLS CORPORATION,

*Plaintiff-Appellant*,

v.

COMMITTEE ON FOREIGN INVESTMENT IN THE UNITED STATES,
JACOB J. LEW, and BARACK H. OBAMA,

*Defendants-Appellees*.

————————————

On Appeal from the United States District Court for the District of Columbia,
No. 1:12-cv-01513-ABJ (Hon. Amy Berman Jackson)

————————————

## BRIEF FOR APPELLANT RALLS CORPORATION

————————————

TIM TINGKANG XIA
MORRIS, MANNING
  & MARTIN, LLP
1600 Atlanta Financial Center
3343 Peachtree Road NE
Atlanta, GA 30326
(404) 495-3677

PAUL D. CLEMENT
VIET D. DINH
H. CHRISTOPHER BARTOLOMUCCI
GEORGE W. HICKS, JR.
BANCROFT PLLC
1919 M Street NW
Suite 470
Washington, DC 20036
(202) 234-0090
pclement@bancroftpllc.com

*Counsel for Appellant Ralls Corporation*

February 7, 2014

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

Pursuant to Circuit Rule 28(a)(1), Appellant Ralls Corporation hereby provides this certificate as to parties, rulings, and related cases, which includes the disclosure required by Circuit Rule 26.1.

### A.     Parties and *Amici*

Plaintiff-Appellant is Ralls Corporation, a Delaware corporation with its principal place of business in Georgia.  Ralls develops, constructs, and operates windfarms throughout the United States.  Ralls has no parent company, and no publicly held company has a 10% or greater ownership interest in Ralls.

Defendants-Appellees are the Committee on Foreign Investment in the United States ("CFIUS"); Jacob J. Lew, in his official capacity as Secretary of the Treasury and Chairperson of CFIUS; and Barack H. Obama, in his official capacity as President of the United States.  Timothy F. Geithner was a defendant in the court below in his official capacity as Secretary of the Treasury and Chairperson of CFIUS; he is not a party in this Court.

In the district court, the following appeared as *amici* supporting Ralls: Oregon Windfarms, LLC; Kent Madison; William J. Doherty; and Ivar Christensen.

### B.    Rulings Under Review

Ralls appeals from two rulings issued by the Honorable Amy Berman Jackson of the United States District Court for the District of Columbia.  First, on February 22, 2013, Judge Jackson issued a memorandum opinion and order granting in part and denying in part Defendants' first motion to dismiss; on February 26, 2013, Judge Jackson amended her opinion to correct a clerical error. The amended opinion is published at 926 F. Supp. 2d 71 and is located in the appendix at JA-99-141.

Second, on October 9, 2013, Judge Jackson issued a memorandum opinion and order granting Defendants' second motion to dismiss; on October 10, 2013, Judge Jackson amended that opinion to correct a clerical error.  The amended opinion will be published at ___ F. Supp. 2d ___, 2013 WL 5583847, and is located in the appendix at JA-143-171.

### C.    Related Cases

This case has not been before this or any other appellate court previously.

This case concerns, *inter alia*, the validity of orders issued by CFIUS and the President prohibiting a commercial transaction into which Ralls entered.  On December 19, 2013, the United States filed a complaint against Ralls in the United States District Court for the District of Columbia seeking enforcement of the presidential order whose legality is the subject of this appeal.  *See United States v.*

*Ralls Corp.*, No. 1:13-cv-02026-ABJ (D.D.C.). Ralls filed a motion to dismiss the complaint or, in the alternative, to stay those proceedings pending the resolution of the appeals process in this case. The government subsequently filed a motion for summary judgment. Those motions remain pending before the district court.

In addition, Ralls is currently engaged in litigation against the counterparty to the transaction that the government has prohibited. That litigation concerns whether the presidential order, if valid, renders the transaction void *ab initio* and returns the transaction parties to the *status quo ante*. *See Ralls Corp. v. Terna Energy USA Holding Corp.*, No. 13-739 (S.D.N.Y.). That case has been placed on the court's suspense docket pending the final outcome of this case. *See id.*, Dkt. 60. Another case between the same parties and presenting the same issue was filed in the court below and was dismissed on January 31, 2013, for lack of personal jurisdiction and improper venue. *See Ralls Corp. v. Terna Energy USA Holding Corp.*, No. 1:13-cv-117-ABJ (D.D.C.). That ruling was not appealed and is not before this Court.

Counsel is not aware of any other related proceedings, as defined by Circuit Rule 28(a)(1)(C), currently pending before this or any other court.

## TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES............... i

TABLE OF AUTHORITIES.................................................... vi

INTRODUCTION .......................................................... 1

JURISDICTIONAL STATEMENT .......................................... 2

STATEMENT OF THE ISSUES ........................................... 3

STATEMENT OF FACTS ................................................. 3

    A.    Statutory and Regulatory Background ................................. 3

    B.    Ralls's Acquisition and Development of the Butter Creek Projects ...................................................... 6

    C.    The CFIUS Orders.................................................. 8

    D.    The Presidential Order................................................11

    E.    Proceedings Below .............................................. 13

SUMMARY OF ARGUMENT............................................ 16

STANDARD OF REVIEW .............................................. 18

ARGUMENT ............................................................ 19

I.    THE PRESIDENT'S ORDER DEPRIVED RALLS OF PROPERTY AND LIBERTY WITHOUT DUE PROCESS........................ 19

    A.    Ralls Was Deprived of Constitutionally Protected Property and Liberty Interests.......................................... 19

        1.    The Possibility That the President Might Exercise Section 721(d) Authority To Divest Ralls's Property Rights Does Not Mean That Ralls Lacked Protected Property Interests. .................................................. 21

2.      A Party's Decision Not to Seek CFIUS Review Before Completion of a Transaction Does Not Forfeit Due Process Protections. ................................................. 22

3.      The President Must Make Specific Findings Particular to the Transaction at Issue In Order to Exercise Authority Under Section 721. .................................................. 26

B.      Ralls Was Deprived of Its Protected Interests Without Notice of the Grounds for the Government's Actions or an Opportunity to Rebut Those Grounds. ................................................ 32

1.      The Private Interests Infringed by the Presidential Order Are Significant. ................................................. 33

2.      The Government's Denial of Notice and Opportunity for Rebuttal Presents a Severe Risk of Erroneous Deprivation. ............................................................. 34

3.      A Wholly Unexplained Assertion of National Security Does Not Satisfy Due Process. ................................................. 43

II.      RALLS'S CHALLENGE TO THE CFIUS ORDERS IS NOT MOOT  BECAUSE CFIUS'S ACTIONS ARE CAPABLE OF REPETITION YET EVADE REVIEW. ....................................................... 46

A.      CFIUS Orders Expire Before They Can Be Fully Litigated. ............. 47

B.      There is a Reasonable Expectation that Ralls Will Be Subject to a CFIUS Order in the Future ............................................ 51

III.      CFIUS'S ORDERS VIOLATE DUE PROCESS AND THE ADMINISTRATIVE PROCEDURE ACT. .................................................. 57

CONCLUSION ....................................................................................... 59

CERTIFICATE OF COMPLIANCE

ADDENDUM

CERTIFICATE OF SERVICE

v

# TABLE OF AUTHORITIES[*]

**Cases**

*Adams Fruit Co. v. Barrett*,
494 U.S. 638 (1990)....................................................................58

*Aktieselskabet AF 21. November 2001 v. Fame Jeans Inc.*,
525 F.3d 8 (D.C. Cir. 2008) ........................................................25

*Al-Bihani v. Obama*,
594 F. Supp. 2d 35 (D.D.C. 2009) ..............................................45

*Alvin v. Suzuki*,
227 F.3d 107 (3d Cir. 2000) .......................................................23

*Am. Mfrs. Mut. Ins. Co. v. Sullivan*,
526 U.S. 40 (1999)......................................................................19

*Armstrong v. FAA*,
515 F.3d 1294 (D.C. Cir. 2008) ..................................................48

*Atherton v. District of Columbia Office of Mayor*,
567 F.3d 672 (D.C. Cir. 2009) ....................................................18

*Barry v. Barchi*,
443 U.S. 55 (1979)......................................................................27

*Bartlett v. Bowen*,
816 F.2d 695 (D.C. Cir. 1987) ....................................................29

*Bd. of Regents of State Colleges v. Roth*,
408 U.S. 564 (1972)....................................................................25

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)....................................................................18

*\*Boumediene v. Bush*,
553 U.S. 723 (2008)............................................... 32, 35, 39, 43

---

[*] Authorities upon which we chiefly rely are marked with asterisks.

*Bowen v. Mich. Acad. of Family Physicians*,
    476 U.S. 667 (1986)........................................................29

*\*British Caledonian Airways Ltd. v. Bond*,
    665 F.2d 1153 (D.C. Cir. 1981)............................ 49, 52, 53

*Burlington N. R.R. v. Surface Transp. Bd.*,
    75 F.3d 685 (D.C. Cir. 1996) .............................................47

*Carter v. Washington Metro. Area Transit Auth.*,
    503 F.3d 143 (D.C. Cir. 2007) ..........................................18

*\*Christian Knights of Ku Klux Klan Invisible Empire, Inc.*
    *v. District of Columbia*,
    972 F.2d 365 (D.C. Cir. 1992) ....................................51, 53

*Dames & Moore v. Regan*,
    453 U.S. 654 (1981)......................................................28, 31

*\*Del Monte Fresh Produce Co. v. United States*,
    570 F.3d 316 (D.C. Cir. 2009) ......................................48, 50

*\*Doe v. Sullivan*,
    938 F.2d 1370 (D.C. Cir. 1991) ............................... *passim*

*Erickson v. Pardus*,
    551 U.S. 89 (2007).............................................................25

*FCC v. Fox Television Stations, Inc.*,
    132 S. Ct. 2307 (2012).......................................................30

*FEC v. Rose*,
    806 F.2d 1081 (D.C. Cir. 1986) .........................................57

*Ganadera Industrial, S.A. v. Block*,
    727 F.2d 1156 (D.C. Cir. 1984).........................................31

*Gray Panthers v. Schweiker*,
    716 F.2d 23 (D.C. Cir. 1983) .............................................34

*Grayned v. City of Rockford*,
    408 U.S. 104 (1972)...........................................................30

*Greene v. McElroy*,
  360 U.S. 474 (1959)...................................................................39

*Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*,
  484 U.S. 49 (1987).....................................................................23

*Haig v. Agee*,
  453 U.S. 280 (1981)....................................................................43

*Hamdi v. Rumsfeld*,
  542 U.S. 507 (2004) ............................................................ *passim*

*Holy Land Found. for Relief & Dev. v. Ashcroft*,
  333 F.3d 156 (D.C. Cir. 2003) ...................................................35

*Honeywell International, Inc. v. NRC*,
  628 F.3d 568 (D.C. Cir. 2010) ............................................. 50, 53

*Honig v. Doe*,
  484 U.S. 305 (1988).....................................................................52

*Humane Soc'y of U.S. v. EPA*,
  790 F.2d 106 (D.C. Cir. 1986) ....................................................53

*Joint Anti-Fascist Refugee Comm. v. McGrath*,
  341 U.S. 123 (1951)................................................................ 43, 45

*Kahane Chai v. Dep't of State*,
  466 F.3d 125 (D.C. Cir. 2006) ....................................... 32, 35, 39, 40

*Kentucky Dep't of Corrections v. Thompson*,
  490 U.S. 454 (1989)................................................................ 22, 31

*Lepre v. Dep't of Labor*,
  275 F.3d 59 (D.C. Cir. 2001) .......................................................29

*Mathews v. Eldridge*,
  424 U.S. 319 (1976)......................................................................32

*Nat'l Council of Resistance of Iran v. Dep't of State*,
  251 F.3d 192 (D.C. Cir. 2001) ................................................. *passim*

*Nat'l Council of Resistance of Iran v. Dep't of State*,
  373 F.3d 152 (D.C. Cir. 2004) ...................................................................... 38, 45

*Newdow v. Roberts*,
  603 F.3d 1002 (D.C. Cir. 2010) ..........................................................................48

*Parker v. Bd. of Regents of Tulsa Junior College*,
  981 F.2d 1159 (10th Cir. 1992) ...........................................................................23

*Paul v. Davis*,
  424 U.S. 693 (1976)...................................................................................... 20, 21

*People for the Ethical Treatment of Animals, Inc. v. Gittens*,
  396 F.3d 416 (D.C. Cir. 2005) ..................................................................... 54, 55

*People's Mojahedin Org. of Iran v. U.S. Dep't of State*,
  182 F.3d 17 (D.C. Cir. 1999) ...................................................................... 42, 45

*People's Mojahedin Org. of Iran v. Dep't of State*,
  327 F.3d 1238 (D.C. Cir. 2003) ................................................................... 37, 45

*\*People's Mojahedin Org. of Iran v. U.S. Dep't of State*,
  613 F.3d 220 (D.C. Cir. 2010) ............................................................... *passim*

*\*In re People's Mojahedin Org. of Iran*,
  680 F.3d 832 (D.C. Cir. 2012) ............................................................ 32, 38, 40

*\*Performance Coal Co. v. Fed. Mine Safety & Health Review*
  *Comm'n*, 642 F.3d 234 (D.C. Cir. 2011)........................................... 47, 48, 50, 51

*Perry v. Sindermann*,
  408 U.S. 593 (1972)............................................................................................22

*Phillips v. Wash. Legal Found.*,
  524 U.S. 156 (1998)............................................................................................19

*Pub. Citizen, Inc. v. FAA*,
  988 F.2d 186 (D.C. Cir. 1993) ..........................................................................57

*Sparrow v. United Air Lines, Inc.*,
  216 F.3d 1111 (D.C. Cir. 2000)...........................................................................18

ix

*Texaco, Inc. v. Dep't of Energy*,
  663 F.2d 158 (D.C. Cir. 1980) ..........................................................47

*Theodore Roosevelt Conservation P'ship v. Salazar*,
  661 F.3d 66 (D.C. Cir. 2011).................................................... 51, 52

*Town of Castle Rock v. Gonzales*,
  545 U.S. 748 (2005).........................................................................31

*Turner v. Rogers*,
  131 S. Ct. 2507 (2011) ....................................................................46

*U.S. Parole Comm'n v. Geraghty*,
  445 U.S. 388 (1980)..........................................................................52

*Ungar v. Smith*,
  667 F.2d 188 (D.C. Cir. 1981) ........................................................29

*United Brotherhood of Carpenters & Joiners of America
  v. Operative Plasterers' & Cement Masons' Int'l Ass'n of the
  United States & Canada*,
  721 F.3d 678 (D.C. Cir. 2013) ........................................................50

*United States v. James Daniel Good Real Prop.*,
  510 U.S. 43 (1993)............................................................................19

*Vermont Agency of Nat. Res. v. United States ex rel. Stevens*,
  529 U.S. 765 (2000)..........................................................................31

*Washington Post v. Robinson*,
  935 F.2d 282 (D.C. Cir. 1991) ........................................................49

*Webster v. Doe*,
  486 U.S. 592 (1988)..........................................................................29

*Weinstein v. Bradford*,
  423 U.S. 147 (1975)..........................................................................51

*Wilkinson v. Austin*,
  545 U.S. 209, 209 (2005)........................................................ 34, 39

*Yee v. City of Escondido*,
  503 U.S. 519 (1992)..........................................................................26

x

## Constitutional Provision

U.S. Const. amend. V ..................................................................................19

## Statutes

5 U.S.C. § 706(2)(A) .................................................................................56

5 U.S.C. § 706(2)(B) .................................................................................56

5 U.S.C. § 706(2)(C) .................................................................................57

8 U.S.C. § 1189(a)(1)(A) ...........................................................................33

50 U.S.C. app. § 2170(a)(3) ........................................................ 4, 52, 57

50 U.S.C. app. § 2170(b)(1)(A)(i) ..............................................................4

50 U.S.C. app. § 2170(b)(1)(C) ..................................................................4

50 U.S.C. app. § 2170(b)(1)(D) ..................................................................4

50 U.S.C. app. § 2170(b)(1)(E) .......................................................... 4, 47

50 U.S.C. app. § 2170(b)(2)(B) ..................................................................4

50 U.S.C. app. § 2170(b)(2)(C) .......................................................... 4, 47

50 U.S.C. app. § 2170(d)(1) ............................................................... 5, 27

50 U.S.C. app. § 2170(d)(2) .....................................................................47

50 U.S.C. app. § 2170(d)(4)(A) ....................................... 5, 27, 36, 44

50 U.S.C. app. § 2170(d)(4)(B) ......................................................... 5, 27

50 U.S.C. app. § 2170(d)(5) .....................................................................28

50 U.S.C. app. § 2170(e) .................................................................... 5, 13

50 U.S.C. app. § 2170(f) ...........................................................................28

50 U.S.C. app. § 2170(k)(2) ........................................................................3

50 U.S.C. app. § 2170(k)(3) ........................................................................3

50 U.S.C. app. § 2170(*l*)(1)(A) ........................................................... 4, 47

**Regulations**

31 C.F.R. § 800.221 ............................................................................58

31 C.F.R. § 800.224 ........................................................................... 22

31 C.F.R. § 800.401(a) ................................................................ 4, 8, 22

31 C.F.R. § 800.402(c)(1)(vii) ........................................................... 22

31 C.F.R. § 800.504 ............................................................................47

31 C.F.R. § 800.506(b)..........................................................................4

31 C.F.R. § 800.506(d)........................................................................47

31 C.F.R. § 800.601(a)(2) ...................................................................47

31 C.F.R. § 800.601(a)(3) ...................................................................47

**Other Authorities**

CFIUS, CY 2012 Annual Report to Congress (2013) ............................24

Exec. Order No. 13456 § 3(b), 73 Fed. Reg. 4677 (Jan. 23, 2008)..........................3

Ex. C to Brief in Supp. of Mot. for TRO and Prelim. Inj., *Ralls Corp. v. Terna Energy USA Holding Corp.*, No. 13-739 (S.D.N.Y. Feb. 8, 2013) (Dkt. 16) ................................................................34

Henry J. Friendly, *Some Kind of Hearing*, 123 U. Pa. L. Rev. 1267 (1975) ......................................................34

Notice of Withdrawal of Appl. For Prelim. Inj., *Del Monte Fresh Produce Co. v. United States*, No. 07-2143 (D.D.C. Nov. 30, 2007) (Dkt. 5)................................................................................50

Barack Obama, Remarks by the President at a Campaign Event in Davenport, Iowa (Oct. 24, 2012), http://tinyurl.com/iowaremarks....................37

Jill Priluck, *The Mysterious Agency That Can Block a Global Merger*, Reuters (July 8, 2013), http://tinyurl.com/priluck .................................1

Scott Shane, *Iranian Dissidents Convince U.S. to Drop Terror Label*,
    N.Y. Times (Sept. 21, 2012)...............................................................................41

5 Wright & Miller,
    Federal Practice & Procedure § 1219 (3d ed. 2014)...........................................25

## INTRODUCTION

This case involves an extraordinary assertion of power by the federal government to deprive a U.S. company of its constitutionally protected property and liberty interests without any meaningful explanation or opportunity for rebuttal—in short, without due process.  The government's denial of due process is as complete as its exercise of unilateral executive power is exceptional.

Two years ago, Ralls Corporation, an American company with foreign ownership, purchased four small Oregon companies in order to develop windfarms.  After the transaction closed and Ralls began construction work, the government ordered Ralls to sell off the four companies, destroy what it had constructed, stay off its land, and refrain from selling its own goods.

This sweeping edict came from an obscure committee—the Committee on Foreign Investment in the United States, or "CFIUS."[1]  CFIUS gave no explanation for its order other than asserting that Ralls's ownership of the companies raised "national security risks."  When Ralls protested, CFIUS elevated the matter to the President, who issued his own order declaring that the transaction was "prohibited" and imposing even more severe deprivations.  Like CFIUS, the President gave no

---

[1] *See* Jill Priluck, *The Mysterious Agency That Can Block a Global Merger*, Reuters (July 8, 2013), http://tinyurl.com/priluck ("Much of the way CFIUS operates is lore, rather than law.").

reasons for his actions except that Ralls, through ownership of the companies, "might take action that threatens to impair the national security."

The actions of CFIUS and the President violated the fundamental requirements of due process. To this day, the government has provided no explanation, justification, or evidentiary support for its actions other than incanting the words "national security." And Ralls has had no chance to rebut the government's grounds for depriving Ralls of its property and liberty—because the government refuses to say what those grounds are.

Notwithstanding this complete denial of due process, the district court rejected Ralls's constitutional challenge to the presidential order. It held that Ralls not only received sufficient process but had no constitutionally protected interests in the first place. The court below also held that Ralls's challenge to CFIUS's actions was moot. Both holdings are inconsistent with well-established law and thus should be reversed.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1331 because Ralls challenged the lawfulness of actions taken by CFIUS and the President. This Court has jurisdiction under 28 U.S.C. § 1291 because the district court dismissed all of Ralls's claims and issued a final order on October 9, 2013. Ralls timely noticed its appeal on October 16, 2013.

## STATEMENT OF THE ISSUES

1.     Whether the presidential order prohibiting Ralls's purchase of four Oregon companies and impairing other protected property and liberty interests violates Ralls's constitutional right to due process.

2.     Whether the revocation of CFIUS orders by the presidential order mooted Ralls's challenge to those CFIUS orders despite the "capable of repetition, yet evading review" doctrine.

3.     Whether the CFIUS orders violate the Constitution and the Administrative Procedure Act.

## STATEMENT OF FACTS

### A.     Statutory and Regulatory Background

This case involves Section 721 of the Defense Production Act of 1950, as amended, 50 U.S.C. app. § 2170 ("Section 721"), the statute that governs CFIUS and presidential actions of the kind at issue here.

CFIUS is a government committee that reviews transactions that could result in control of a U.S. business by a foreign person to assess their effect on national security. The Secretary of the Treasury serves as Chairperson of CFIUS; the heads of other federal departments and offices are members. *See* 50 U.S.C. app. § 2170(k)(2)-(3); Exec. Order No. 13456 § 3(b), 73 Fed. Reg. 4677 (Jan. 23, 2008).

CFIUS may only review a "covered transaction," defined as "any merger, acquisition, or takeover … by or with any foreign person which could result in foreign control of any person engaged in interstate commerce in the United States." 50 U.S.C. app. § 2170(a)(3). CFIUS review typically begins when parties to a covered transaction file a voluntary notice with CFIUS, though under certain circumstances CFIUS can initiate the review *sua sponte*. *Id.* § 2170(b)(1)(C)-(D). Parties to a covered transaction are not required to seek CFIUS review at all, much less before the transaction is complete. Indeed, CFIUS regulations contemplate that CFIUS review may occur after a transaction is complete. *See* 31 C.F.R. § 800.401(a) (parties to a "proposed or completed transaction" may file voluntary notice).

Upon receiving the voluntary notice, CFIUS reviews the transaction "to determine the effects of the transaction on the national security of the United States." 50 U.S.C. app. § 2170(b)(1)(A)(i). This review must be completed within 30 days of the voluntary notice. *Id.* § 2170(b)(1)(E). CFIUS may subsequently determine that further investigation is appropriate. *Id.* § 2170(b)(2)(B). Any such investigation must be completed within 45 days. *Id.* § 2170(b)(2)(C).

During the review and investigation period, CFIUS may "negotiate, enter into or impose, and enforce any agreement or condition with any party to the covered transaction in order to mitigate any threat to the national security of the

4

United States that arises" from the covered transaction. *Id.* § 2170(*l*)(1)(A). After an investigation, if CFIUS "recommends that the President suspend or prohibit the transaction," it must send a report "requesting the President's decision." 31 C.F.R. § 800.506(b).

In subsection (d) of Section 721, Congress authorized the President to "take such action for such time as [he] considers appropriate to suspend or prohibit any covered transaction that threatens to impair the national security of the United States." 50 U.S.C. app. § 2170(d)(1). Congress granted this power, however, "[s]ubject to paragraph (4)" of that subsection. *Id.* In paragraph (4), Congress legislated that the President may exercise this sweeping authority "only if" he finds that (1) "there is credible evidence that leads [him] to believe that the foreign interest exercising control might take action that threatens to impair the national security"; and (2) "provisions of law, other than [Section 721] and the International Emergency Economic Powers Act, do not, in [his] judgment …, provide adequate and appropriate authority for [him] to protect the national security in the matter before [him]." *Id.* § 2170(d)(4)(A)-(B).

The statute provides that the President's findings and actions under Section 721 "shall not be subject to judicial review." *Id.* § 2170(e).

### B.    Ralls's Acquisition and Development of the Butter Creek Projects

In 2009, Oregon Windfarms, LLC, an Oregon company owned by U.S. citizens, created four Oregon limited liability companies:  Pine City Windfarm, LLC; Mule Hollow Windfarm, LLC; High Plateau Windfarm, LLC; and Lower Ridge Windfarm, LLC (collectively, the "Project Companies").  JA-47.  The Project Companies were created for the purpose of developing windfarms— respectively, Pine City, Mule Hollow, High Plateau, and Lower Ridge windfarms (collectively, the "Butter Creek Projects").  *Id.*  Each company soon held certain assets necessary for windfarm development, including easements with local private landowners to access their property and construct turbines, agreements to sell power to the local utility, and government permits to construct, for each windfarm, five turbines at specific locations.  JA-47-48.[2]

The federal government maintains a restricted airspace and bombing range near the Butter Creek Projects.  JA-48.  The restricted airspace, which encompasses the property of numerous private landowners and two federal interstate highways, is used by aircraft from a Navy base located over 200 miles away.  JA-48-49.  Hundreds of windfarm turbines are currently located in or around the restricted airspace; dozens if not hundreds of those turbines are foreign-made and foreign-owned.  JA-49-52.  Three of the Butter Creek Projects—Mule

_____

[2] A turbine is a windmill-like apparatus sitting atop a tower rising from the ground.

Hollow, Upper Plateau, and Pine City—are outside the restricted airspace. One project, Lower Ridge, is within the restricted airspace. JA-49.

In 2010 and 2011, the Federal Aviation Administration issued a "Determination of No Hazard" for each of the 20 planned turbines of the Butter Creek Projects. JA-48. The FAA's process for making a no-hazard determination includes review by the Department of Defense, the purpose of which is to prevent, minimize, or mitigate adverse impacts on military operations, readiness and testing. *Id.*

Ralls is a Delaware corporation with its principal place of business in Georgia. JA-43. Its owners are two Chinese citizens, Dawei Duan and Jialiang Wu. *Id.* Mr. Duan is the CFO of the Sany Group ("Sany"), a Chinese global manufacturing company; Mr. Wu was at the time a Vice President of Sany and General Manager of Sany Electric Company, a Sany subsidiary. *Id.* Ralls develops, constructs, and operates windfarms throughout the United States for the purpose of using Sany turbines and demonstrating their quality and reliability to the U.S. wind industry. JA-52. The Butter Creek Projects are ideally suited for this objective given the existence of hundreds of nearby windfarms using competitors' turbines. *Id.*

In December 2010, Oregon Windfarms sold its interests in the Project Companies to Terna Energy USA Holding Corporation ("Terna"), a Delaware

corporation owned by Terna Energy SA, a Greek company.  *Id.*  In March 2012, Terna sold its interests in the Project Companies to Ralls.  *Id.*

Shortly after Ralls acquired the Project Companies, the United States Navy expressed concerns regarding the location of the Lower Ridge windfarm.  JA-53. The Navy articulated the nature of its concerns and asked Ralls to move the windfarm to "reduce airspace conflicts between the Lower Ridge wind turbines and low-level military aircraft training."  *Id.*  Ralls agreed, at significant expense and effort, to move the windfarm to a new location, which in turn required Ralls to obtain additional approvals from the Oregon Public Utility Commission.  The Navy wrote to the Commission on Ralls's behalf, recommending that the requested approvals issue and adding that it "appreciat[ed]" Ralls's "cooperation and consideration" in agreeing to move the Lower Ridge windfarm.  *Id.*  The Navy did not express concerns to Ralls about any of the three other windfarms.  *Id.*  Ralls began construction of the turbines on April 23, 2012.  *Id.*

### C.    The CFIUS Orders

On June 28, 2012, as "parties to a … completed transaction," 31 C.F.R. § 800.401(a), Ralls and Terna submitted a voluntary notice informing CFIUS of Ralls's recent acquisition of the Project Companies from Terna.  JA-54.  In the following weeks, CFIUS asked Ralls a number of follow-up questions, and Ralls timely provided written responses.  *Id.*  Ralls was given one opportunity to meet

8

with CFIUS staff during this period.  JA-54-55.  During that meeting, CFIUS staff did not disclose to Ralls any concerns or evidence it had obtained related to any supposed national security risks raised by Ralls's acquisition of the windfarms.  *Id.*

On July 25, 2012, CFIUS issued an "Order Establishing Interim Mitigation Measures" regarding the Ralls-Terna transaction.  JA-55, JA-81-84.  In the order, CFIUS asserted that "there are national security risks to the United States that arise as a result of the [t]ransaction."  JA-55, JA-82.  CFIUS ordered that Ralls and the Project Companies:

- "Shall immediately cease all Construction and Operations, and shall not undertake any further Construction and Operations, at the Properties" (*i.e.*, the windfarm construction sites);

- "Shall remove all stockpiled or stored items from the Properties"; and

- "Shall immediately cease all access, and shall not have any access, to the Properties," except "for the purposes of removing any items from the Properties."

JA-55, JA-82-83.  The order provided no evidence or further explanation for CFIUS's actions.

Ralls immediately suspended construction at the windfarms.  JA-56.  By that point, Ralls had already completely constructed five turbine foundations and had partially constructed seven other foundations, all designed to fit Sany turbines.  *Id.*  On July 26, in a good-faith effort to resolve CFIUS's concerns, Ralls informed CFIUS that it was considering selling the Project Companies, with several

9

American buyers having expressed interest. *Id.* On July 31, Ralls informed CFIUS that it intended to complete a transfer of the Project Companies to an American buyer as early as the end of that week. *Id.*

In response, CFIUS issued an "Amended Order Establishing Interim Mitigation Measures" on August 2, 2012. JA-56, JA-85-88. The Amended Order applied not only to Ralls and the Project Companies, but also to the Sany Group (including Sany Electric). JA-56, JA-85. Without explanation, it imposed additional restrictions on top of the July Order, ordering that Ralls and the other companies shall not:

- "sell or otherwise transfer or propose, or otherwise facilitate the sale or transfer to any third party for use or installation at the Properties of any items made or otherwise produced by the Sany Group"; or

- "complete a sale or transfer of the Project Companies or their assets to any third party" until (i) all "items deposited, installed, or affixed (including concrete foundations) on the properties have been removed," (ii) CFIUS has been notified of the intended recipient or buyer; and (iii) CFIUS has not objected within 10 business days.

JA-56-57, JA-86.

On September 12, 2012, Ralls filed suit alleging that CFIUS's actions violated the Administrative Procedure Act ("APA") and due process. The next day, Ralls moved for a temporary restraining order and preliminary injunction enjoining enforcement of the CFIUS orders. Following discussion by the parties, Ralls withdrew its motion after the government agreed to allow Ralls to resume certain

10

preliminary construction activities.  *See* Notice of Withdrawal of Mot. for TRO and Prelim. Inj. (Sept. 19, 2012) (Dkt. 14).

### D.    The Presidential Order

On September 13, 2012, CFIUS transmitted a report to the President regarding Ralls's acquisition of the windfarms.  JA-57-58.  On September 28, 2012, President Obama issued an "Order Regarding the Acquisition of Four U.S. Wind Farm Project Companies by Ralls Corporation."  JA-58, JA-89-92.

The presidential order stated that "[t]here is credible evidence" that "leads [the President] to believe" that Ralls, Sany, and Messrs. Duan and Wu, "through exercising control of" the Project Companies, "might take action" that "threatens to impair the national security of the United States."  JA-58, JA-89.  It added that "[p]rovisions of law," aside from Section 721 and the International Emergency Economic Powers Act, "do not … provide adequate and appropriate authority for [the President] to protect the national security in this matter."  JA-58, JA-89.  The order provided no further findings.

The presidential order imposed sweeping and severe sanctions upon Ralls.  First, it outlawed the completed deal:  "The transaction resulting in the acquisition of the Project Companies and their assets by [Ralls] or Mr. Wu or Mr. Duan is hereby prohibited."  JA-58-59, JA-89.  It likewise prohibited "ownership by [Ralls] or Mr. Wu or Mr. Duan of any interest in the Project Companies and their assets,

11

whether directly or indirectly." JA-58-59, JA-89. And it ordered Ralls to divest, within 90 days, "all interests" in the Project Companies, their "assets, intellectual property, technology, personnel, and customer contracts," and "any operations developed, held, or controlled … by the Project Companies at the time of, or since, their acquisition." JA-58-59, JA-89-90.

Second, the order imposed other restrictions on Ralls's property, ordering that Ralls shall:

- "remove from the properties … all items, structures, or other physical objects or installations of any kind (including concrete foundations) that [Ralls has] stockpiled, stored, deposited, installed, or affixed thereon";

- "cease all access, and will not have any access, to the Properties," except "solely for the purposes of" removing items;

- "not sell or otherwise transfer … any items made or otherwise produced by the Sany Group to any third party for use or installation at the Properties"; and

- "not complete a sale or transfer of the Project Companies or their assets to any third party" without CFIUS approval.

JA-59, JA-90-91.

Third, the order gave the government access to Ralls's unrelated property and beyond. It directed that federal agents "shall be permitted access … to all premises and facilities of the Project Companies and [Ralls] located in the United States" in order to:

- "inspect and copy any books, ledgers, accounts, correspondence, memoranda, and other records and documents in the possession or under

12

the control of [Ralls] or the Project Companies that concern any matter relating to this order"; and

- "inspect any equipment and technical data (including software) in the possession or under the control of [Ralls] or the Project Companies."

JA-59-60, JA-91.  The order authorized the Attorney General to enforce it, and it declared the previous CFIUS orders "revoked."  JA-60, JA-91.

At no time before the issuance of either the CFIUS orders or the presidential order was Ralls given an opportunity to view or respond to any of the supposed "credible evidence" upon which CFIUS, the President, or anyone else relied in concluding that Ralls's acquisition of the Project Companies "threatens to impair the national security."  JA-61.  Ralls was never provided with any reason or explanation for the government's actions aside from the vague invocation of "national security."  *Id.*  Nor was Ralls given any chance to provide its own evidence rebutting the government's (unexplained) reasons for its actions.  *Id.* Ralls was provided no notice of the wide-ranging restrictions that CFIUS and the President imposed, nor any hearing to challenge their imposition.  *Id.*  Ralls denies that its acquisition of the Project Companies or development of the windfarms will threaten national security.  *Id.*

### E.    Proceedings Below

Ralls amended its complaint to add claims that the presidential order violated its rights to due process and equal protection and constituted *ultra vires*

action.  JA-39-92.  The government moved to dismiss the amended complaint contending, first, that Section 721's finality provision, 50 U.S.C. app. § 2170(e), barred judicial review of *any* of Ralls's claims regarding the presidential order; and, second, that Ralls's challenge to the CFIUS orders was moot.

The district court granted the government's motion in part and denied it in part.  JA-97-141.  In an amended opinion dated February 26, 2013, the court held that Section 721's finality provision barred review of Ralls's *ultra vires* and equal protection challenges to the presidential order, but did not bar Ralls's due process claim.  JA-117-133.  The court also held that Ralls's challenge to the CFIUS orders was moot because the presidential order had revoked them; the court rejected Ralls's contention that the "capable of repetition, yet evading review" exception applied.  JA-133-140.

The court invited a government motion to dismiss, for failure to state a claim, Ralls's remaining claim—its due process challenge to the presidential order. JA-97-98.  The government so moved, and the court granted the motion in an amended opinion dated October 10, 2103.  The court first held that the presidential order did not deprive Ralls of any constitutionally protected interests.  "There is no dispute," found the court, that Ralls "entered into a transaction in March 2012 through which it obtained certain property rights under state law," including the Project Companies and the assets they held.  JA-153.  Nevertheless, the court ruled

that Ralls possessed no constitutionally protected interests because Ralls "voluntarily acquired those state property rights subject to the known risk of a Presidential veto," and Ralls "waived the opportunity … to obtain a determination from CFIUS and the President before it entered into the transaction." JA-154. The court also held that Ralls lacked protected interests because Section 721 gives the President "absolute, unreviewable discretion to prohibit a covered transaction" and "places no conditions on the President's discretion." JA-157, JA-159.

The court next held that Ralls received sufficient process. In the court's view, Ralls "was given notice before the [President's] decision was made" and "was heard," because of the voluntary notice it provided to CFIUS and the follow-up meeting with CFIUS staff. JA-163. The court also rejected Ralls's contention that due process entitled Ralls to be informed of at least the unclassified evidence supporting the presidential order and have an opportunity to rebut that evidence. JA-163. In the court's view, any protected interest of Ralls was "relatively weak in the face of the strong governmental interest in protecting the national security," so the government was entitled to withhold all evidence and refrain from articulating any basis for its decision. JA-164.[3]

---

[3] After this appeal was docketed, the government on December 19, 2013, filed a new lawsuit alleging that Ralls was not in compliance with the presidential order for failure to divest the Project Companies. *See United States v. Ralls Corp.*, No. 1:13-cv-02026-ABJ (D.D.C.). Ralls has moved to dismiss the case or stay it

## SUMMARY OF ARGUMENT

**I. A.** The presidential order violated Ralls's Fifth Amendment right to due process. Ralls clearly possessed constitutionally protected property and liberty interests. Indeed, even the district court acknowledged that Ralls acquired property rights in the Project Companies and their assets that are recognized by state law. When the presidential order required Ralls to divest those interests, destroy tangible items it had already built, and refrain from setting foot on the windfarm properties or freely selling its own turbines, it deprived Ralls of protected interests, thereby triggering due process requirements. The district court erred in holding that Ralls nevertheless had no constitutionally protected interests because it (i) assumed the risk that the President might prohibit the transaction with Terna, and (ii) did not obtain a determination from CFIUS before it completed the transaction. Whatever other risks Ralls assumed, the Constitution does not force it to run the risk that its property would be deprived without due process of law. Nor does the availability of an earlier but equally procedurally-flawed opportunity to elicit a government veto somehow change the analysis. And the court's view that Section 721 gives the President "absolute" discretion to prohibit a covered transaction and places "no conditions" on the President's authority simply misreads the statute.

---

pending resolution of this appeal. The government has moved for summary judgment. Those motions remain pending.

**B.** Ralls was deprived of its protected interests without the basic requirements of due process.  Even in the context of governmental actions taken in the name of national security, a party must still be given notice of the factual basis for those actions—including unclassified evidence upon which the government relied—and a fair opportunity to rebut the allegations against it.  Ralls received none of these.  The only explanation Ralls has ever received for the government's extraordinary assertion of executive power is that its acquisition of the Project Companies might impair the national security.  That is a conclusion, not a reason, and it provides no opportunity whatsoever for Ralls to rebut whatever allegations underlie that conclusion.  Neither Ralls's voluntary notice to CFIUS nor its single meeting with CFIUS staff provided that opportunity, since in both contexts Ralls had to prove a negative, without knowing the bases for the government's action.  Even in the national security context, the opportunity to address unarticulated concerns is not due process.

**II.** Ralls's challenge to CFIUS's orders remains justiciable.  Although the President revoked those orders when he issued his own order, Ralls's challenge is justiciable under the "capable of repetition, yet evading review" doctrine.

**A.** Under this Court's "two-year rule," an agency action that cannot be fully litigated within two years "evades review."  As the government conceded below,

17

the short-lived nature of CFIUS orders means that they cannot be fully litigated within a two-year period.

**B.** The legal wrong that Ralls challenges is also "capable of repetition." As a foreign-owned company whose business plan is to acquire American companies to develop windfarms and use turbines made by a Chinese company, there is a reasonable expectation that Ralls will be subjected to the same CFIUS policies, regulations, or actions that it challenges here. And certainly the fact that Ralls never learned about the nature of the government's objections—and so cannot precisely gauge the likelihood of such objections being raised to future projects—cannot be invoked to Ralls's detriment.

**III.** CFIUS's orders violate the Due Process Clause and the APA. The orders violate due process for the same reasons the presidential order does so, and they violate the APA because CFIUS failed to provide a reasoned explanation—or, indeed, any explanation at all—for its actions, and because CFIUS exceeded its statutory authority.

## STANDARD OF REVIEW

This Court reviews *de novo* the district court's orders granting the motions to dismiss. *Carter v. Washington Metro. Area Transit Auth.*, 503 F.3d 143, 145 (D.C. Cir. 2007). The Court must "treat the complaint's factual allegations as true" and "grant plaintiff the benefit of all inferences that can be derived from the facts

18

alleged." *Sparrow v. United Air Lines, Inc.,* 216 F.3d 1111, 1113 (D.C. Cir. 2000) (quotation marks omitted). "So long as the pleadings suggest a 'plausible' scenario to 'show that the pleader is entitled to relief,' a court may not dismiss." *Atherton v. District of Columbia Office of Mayor*, 567 F.3d 672, 681 (D.C. Cir. 2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)) (brackets omitted).

## ARGUMENT

## I.   THE PRESIDENT'S ORDER DEPRIVED RALLS OF PROPERTY AND LIBERTY WITHOUT DUE PROCESS.

The Fifth Amendment provides: "No person shall ... be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. The two inquiries "in every due process challenge" are "whether the plaintiff has been deprived of a protected interest in 'property' or 'liberty'" and whether the government's "procedures comport with due process." *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 59 (1999).

### A.   Ralls Was Deprived of Constitutionally Protected Property and Liberty Interests.

There is no question that when Ralls acquired the Project Companies and their assets from Terna, it obtained property interests under state law, as the district court itself acknowledged. *See* JA-153 ("There is no dispute that plaintiff Ralls entered into a transaction in March 2012 through which it obtained certain property rights under state law." (citing Am. Compl. ¶ 60 (JA-52))). Through the transaction with Terna, Ralls acquired a range of property rights, including the

19

rights to possess, use, and dispose of the property; the rights of sale, occupancy, and unrestricted use and enjoyment; and the right to receive the properties' exploitable economic value. *See Phillips v. Wash. Legal Found.*, 524 U.S. 156, 169-70 (1998); *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 54 (1993). Thus, Ralls had, at the time the presidential order issued, numerous property interests protected by the Due Process Clause. *See Paul v. Davis*, 424 U.S. 693, 710 (1976) (interests "attain th[e] constitutional status" of being "within the meaning of either 'liberty' or 'property' as meant in the Due Process Clause" when "they have been initially recognized and protected by state law").

The district court nonetheless held that Ralls did not possess any protected interests cognizable under the Constitution. Three reasons appear to undergird this remarkable conclusion. First, it stated that Ralls "undertook the transaction [with Terna] and voluntarily acquired [the resulting] state property rights subject to the known risk of a Presidential veto." JA-154; *see also* JA-156 ("Ralls cannot predicate a due process claim now on the state law rights it acquired when it went ahead and assumed that risk"). Second, it said that "Ralls waived the opportunity … to obtain a determination from CFIUS and the President before it entered into the transaction." JA-154; *see also* JA-156 ("Ralls had the ability to obtain a determination about whether the transaction would have been prohibited before it acquired the property rights allegedly at stake, but it chose not to avail itself of that

20

opportunity"). And third, it asserted that Section 721 "gives the President absolute, unreviewable discretion to prohibit a covered transaction" and "places no conditions on the President's discretion." JA-157, JA-159. Each reason is unavailing.

> **1.  The Possibility That the President Might Exercise Section 721(d) Authority To Divest Ralls's Property Rights Does Not Mean That Ralls Lacked Protected Property Interests.**

The district court's first ruling—that Ralls "assumed the risk" of a "Presidential veto"—is clearly wrong and requires little discussion. As the court itself recognized, there is "no dispute" that Ralls acquired state-law property rights through the transaction with Terna. JA-153. Once Ralls acquired property rights under state law, the Due Process Clause attached to those rights, thus requiring any subsequent governmental action infringing on them to comport with the Constitution. *See, e.g.*, *Paul*, 424 U.S. at 710. Even assuming that state-law property interests once acquired could be deprived by federal law—and that property owners had to face that risk—that would not mean that the federal government could deprive the owner of those state-law rights *without due process*. The government cannot evade the limits of the Due Process Clause by announcing that future deprivations of property may be forthcoming so that anyone who purchases property has assumed the risk of those arbitrary deprivations.

### 2.    A Party's Decision Not to Seek CFIUS Review Before Completion of a Transaction Does Not Forfeit Due Process Protections.

The district court's next holding—that Ralls "waived" its protected interests because it did not "obtain a determination from CFIUS and the President before it entered into the transaction," JA-154—is equally meritless.  First, the court's view that the availability of a pre-transaction *process* somehow affects the nature of the *interest* at stake misunderstands the two prongs of the due process analysis.  A court "examine[s] procedural due process questions in two steps:  the first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient."  *Kentucky Dep't of Corrections v. Thompson*, 490 U.S. 454, 460 (1989) (citation omitted).  To determine the existence of Ralls's protected interests by examining the procedures purportedly available to Ralls erroneously confuses these two separate questions.

Furthermore, CFIUS regulations expressly allow parties to seek CFIUS review *after* a transaction is completed.  *See* 31 C.F.R. § 800.401(a) ("parties to a proposed *or completed* transaction may file a voluntary notice" (emphasis added)); *id*. § 800.402(c)(1)(vii) (voluntary notice must include the "expected date for completion of the transaction, *or the date it was completed*" (emphasis added)); *see also id*. § 800.224 ("The term transaction means a proposed or completed merger,

acquisition, or takeover."). That is exactly what Ralls did: it submitted a voluntary notice triggering CFIUS review following the completion of the Ralls-Terna transaction. It would be passing strange if a party could somehow lose constitutional protection of property interests by engaging in conduct *expressly permitted* by governing law. *See Perry v. Sindermann*, 408 U.S. 593, 600 (1972) (professor whose contract was not renewed had protected property interest in continued employment because of his "legitimate reliance upon guidelines promulgated" by the university creating a form of tenure). Congress could have required parties to seek CFIUS review and approval in advance of all covered transactions (which would have turned CFIUS into a massive, commerce-clogging bureaucracy), but Congress "did not choose this readily available option." *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 57 (1987).

The district court suggested that Ralls had no protected interests because it "waived" an earlier opportunity "provided by the very statute that it claims lacks the necessary process." JA-154. But the statute clearly "provide[s]" that a party need *not* obtain a "determination from CFIUS and the President before it enter[s] into [a] transaction." *Id.* This critical fact distinguishes the situation here from the two cases cited by the district court. *See* JA-156 (citing *Parker v. Bd. of Regents of Tulsa Junior College*, 981 F.2d 1159 (10th Cir. 1992), and *Alvin v. Suzuki*, 227 F.3d

107 (3d Cir. 2000)).  In those cases, the plaintiffs elected to forego the *only* form of review available; here, by contrast, transactions under CFIUS jurisdiction indisputably need not undergo prior review.[4]  And to the extent the district court believed that Ralls lacked protected property interests because it failed to obtain prior *approval* of the transaction, that conclusion is also erroneous.  As the government conceded below, neither review nor approval of a transaction is even required at all.  *See* Defs.' Mem. in Supp. of Mot. to Dismiss 10 (Mar. 21, 2013) (Dkt. 50-1) (Section 721 "does not directly require foreign acquirers to file voluntary notices").

CFIUS typically reviews fewer than 100 transactions per year.  *See* CFIUS, CY 2012 Annual Report to Congress 3 (2013) (269 notices reviewed from 2009 to 2011).  That leaves a staggering number of transactions nominally under CFIUS jurisdiction—any foreign acquisition of any American entity, no matter how large or small—that have not received CFIUS "approval."  By the district court's reasoning, the acquiring parties in those transactions did not actually obtain—and still do not possess—protected property interests, and would have no recourse whatsoever if the government seized them tomorrow.  Indeed, when Terna, a foreign-owned company, purchased the Project Companies from Oregon Windfarms, the parties never sought CFIUS review or approval.  Thus, by the

---

[4] Notably, the government did not cite either of these cases below.

24

district court's reasoning, Terna never possessed any constitutionally protected property interests. When Ralls pointed out that the district court's view "would lead to the conclusion that any 'covered transaction' that closes without submission of a voluntary notice to CFIUS would be subject to an indefinite risk of being unwound by the President at any time without process," the court did not deny the point; it simply shrugged that "this is just what the statute provides." JA-156.

Furthermore, a pre-acquisition request for CFIUS review would not have solved the due process problem. The government has never suggested that it would have provided *more* process if Ralls had sought review earlier. And forgoing one constitutionally inadequate process surely does not estop Ralls from challenging a second constitutionally deficient process, especially when the statute and regulations clearly give it the right to choose. The possibility of obtaining a constitutionally deficient edict at an earlier date should not affect any of the due process analysis, and certainly not whether Ralls had a protectable interest.[5]

---

[5] If Ralls had sought CFIUS review before closing its transaction with Terna— or if the executed Ralls-Terna contract were contingent upon CFIUS approval— Ralls would have had, if not state-law property interests, protected *liberty* interests that the government's subsequent action would have infringed. *See*, *e.g.*, *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 572 (1972) (liberty for due process purposes includes the right to contract). Ralls raised such liberty interests below, *see* Pl. Ralls Corp.'s Mem. in Opp'n to Defs.' Mot. to Dismiss the Am. Compl. 24-25 (Apr. 8, 2013) (Dkt. 52), but the district court refused to consider them, saying "[t]hese interests … were not pled in the complaint." JA-153. But Ralls, having asserted a due process claim in its complaint, *see* JA-71 (quoting Due Process Clause, including "liberty"), was not required to tick off every protected

In short, the failure to provide adequate process violates the Due Process Clause whether the government acts in advance to prohibit an otherwise lawful acquisition of property or acts to undo an acquisition that has already occurred. The nature of the protected interest may change slightly depending on the timing, but the fact remains that, in each case, the government is seeking to bar designated individuals from ownership of property. If there are standards to guide the exercise of that government discretion—as there are here, *see* pp. 26-31, *infra*—then the government cannot interfere with that ownership without extending the safeguards of the Due Process Clause. The government failed to do so here.

### 3. The President Must Make Specific Findings Particular to the Transaction at Issue In Order to Exercise Authority Under Section 721.

The district court also concluded that Ralls lacked constitutionally protected interests because Section 721 gives the President "absolute, unreviewable

---

interest and legal theory it had. "Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim.'" *Erickson v. Pardus*, 551 U.S. 89, 93 (2007). "Specific facts are not necessary; the statement need only give the defendant fair notice of what the claim is and the grounds upon which it rests." *Id.* (quotation marks and ellipses omitted). Moreover, "a complaint need not 'plead law' in specific detail." *Aktieselskabet AF 21. November 2001 v. Fame Jeans Inc.*, 525 F.3d 8, 18 n.5 (D.C. Cir. 2008); *see also* 5 Wright & Miller, Federal Practice & Procedure § 1219 (3d ed. 2014) ("[I]t is unnecessary to set out a legal theory for the plaintiff's claim for relief."). Finally, "once a federal claim is properly presented, a party can make any argument in support of that claim." *Yee v. City of Escondido*, 503 U.S. 519, 534 (1992). Just as parties on appeal "are not limited to the precise arguments they made below," *id.*, a plaintiff in district court has leeway to refine its arguments, particularly on a motion to dismiss and where, as here, the opposing party had ample opportunity to—and did—respond to those arguments.

discretion to prohibit a covered transaction" and "places no conditions on the President's discretion."   JA-157, JA-159.   But that reading of Section 721 is manifestly incorrect.  It conflicts with not only the statutory text but also the very nature of Section 721 proceedings, which are designed to result in an individualized determination applying identifiable standards—the very situation that entitles an adversely affected party to due process protections. *See, e.g.*, *Barry v. Barchi*, 443 U.S. 55, 64 & n.11 (1979).

In Section 721(d)(1), Congress authorized the President to "take such action for such time as [he] considers appropriate to suspend or prohibit any covered transaction that threatens to impair the national security."   50 U.S.C. app. § 2170(d)(1).  This authority, however, is expressly "[s]ubject to paragraph (4)," in which Congress provided that the President may exercise his Section 721(d)(1) authority "only if" he finds that "there is credible evidence that leads [him] to believe that the foreign interest exercising control might take action that threatens to impair the national security."  *Id.* § 2170(d)(4)(A).  Section 721 therefore allows the President to exercise his authority *only if* (1) there is *evidence* that (2) the President deems *credible* that (3) the particular foreign interest *may take action* that (4) *threatens to impair* national security.  The President must also find, in order to exercise his Section 721(d)(1) power, that "provisions of law, other than [Section 721] and the International Emergency Economic Powers Act, do not, in [his]

27

judgment … provide adequate and appropriate authority for [him] to protect the national security in the matter before [him]." *Id.* § 2170(d)(4)(B). Finally, Congress directed that in rendering a Section 721(d)(1) determination, "the President shall consider, among other factors, each of the factors described in subsection (f) of this section, as appropriate." *Id.* § 2170(d)(5). Subsection (f) then sets forth a list of specific and detailed "[f]actors to be considered." *Id.* § 2170(f). To be sure, it contains some language phrased in discretionary terms, but the fact that Congress expressly articulated eleven separate factors—or any factors, for that matter—that "shall" guide the President's decision underscores that Congress did not intend, in Section 721, to give the President a blank check. Thus the district court was quite wrong to conclude that Section 721 simply gives the President "absolute" discretion to prohibit a covered transaction and places "no conditions" on his authority.

That Congress required the President to make particular findings before exercising his authority to suspend or prohibit a specific transaction distinguishes Section 721 from laws authorizing blanket executive or legislative prohibitions absent any particularized determination whatsoever. *See*, *e.g.*, *Dames & Moore v. Regan*, 453 U.S. 654, 662-63 (1981). Here, Ralls has been denied the right to purchase or retain the Project Companies not because there is a broadly applicable ban on the purchase of such companies, but because the President has made an

individualized determination about the suitability of Ralls or its owners as purchasers—*i.e.*, based on Ralls's own individual characteristics. Somewhere, there is supposedly "credible evidence" that led the President to conclude the Ralls's owners "might take action that threatens to impair the national security." Because that individualized determination applying identifiable standards deprived Ralls of its undisputed state-law interests, Ralls is entitled to due process.

In concluding that Section 721 denies Ralls the protection of the Due Process Clause, the district court also repeatedly referred to the "unreviewable" nature of the President's decision. JA-157, JA-159, JA-168, JA-169. But that mixes apples and oranges. Whether a determination is substantively unreviewable is unrelated to whether it was reached in reliance on particularized findings and thereby triggers due process protections. Indeed, the Supreme Court and this Court have repeatedly held that due process challenges may proceed despite statutory finality provisions. *See Webster v. Doe*, 486 U.S. 592 (1988); *Bowen v. Mich. Acad. of Family Physicians*, 476 U.S. 667 (1986); *Lepre v. Dep't of Labor*, 275 F.3d 59 (D.C. Cir. 2001); *Bartlett v. Bowen*, 816 F.2d 695 (D.C. Cir. 1987); *Ungar v. Smith*, 667 F.2d 188 (D.C. Cir. 1981); *Ralpho v. Bell*, 569 F.2d 607 (D.C. Cir. 1977). Those cases have allowed procedural due process claims to proceed precisely because of the importance of minimizing errors in the findings that go into unreviewable decisions. Here, the lack of judicial review makes it all the

29

more important that the President receive evidence from both sides, including rebuttal evidence from Ralls, before making his decision, because that may well affect whether he believes there is "credible evidence" that a party like Ralls "might take action" that "threatens" to "impair the national security."

If, as the district court held, Section 721 truly lacks any standards guiding the President's individualized determination, that construction of the statute raises serious due process concerns. It is a "fundamental principle in our legal system" that "laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox Television Stations, Inc.*, 132 S. Ct. 2307, 2317 (2012). A punishment "fails to comply with due process if the statute or regulation under which it is obtained fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *Id.* (quotation marks omitted). This doctrine addresses "two connected but discrete due process concerns": first, "regulated parties should know what is required of them so they may act accordingly"; and second, "precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way." *Id.*; *see also Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972) ("[I]f arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them.").

30

The district court's reading of Section 721 as "standardless" gives the President wholly unfettered and unreviewable power to eliminate a particular party's state-law interests. That extraordinary construction sets Section 721 apart from the cases relied upon by the government below and cited by the district court. As the district court acknowledged, the state-law interests here indisputably exist; it is not a question of whether state law creates or protects them. *Cf. Town of Castle Rock v. Gonzales*, 545 U.S. 748 (2005); *Kentucky Dep't of Corrections*, 490 U.S. at 454. The interests are not a product of the federal government's largesse that it may later revoke. *Cf. Ganadera Industrial, S.A. v. Block*, 727 F.2d 1156 (D.C. Cir. 1984). And Section 721 does not contain a blanket prohibition; rather, it permits the President to target specific parties and transactions depending on the circumstances and provided that he makes certain findings. *Cf. Dames & Moore*, 453 U.S. at 662-63. Construing Section 721 to allow the President to exercise standardless, unreviewable authority to deprive particular parties of property and liberty interests raises substantial due process problems that, consistent with canons of constitutional avoidance, strongly counsel against such a reading of the statute. *See Vermont Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 787 (2000).

**B.  Ralls Was Deprived of Its Protected Interests Without Notice of the Grounds for the Government's Actions or an Opportunity to Rebut Those Grounds.**

Because Ralls possessed constitutionally protected property and liberty interests, the next question is whether the procedures employed by the government in depriving Ralls of those interests comport with due process.  Three familiar factors guide this determination:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

Determining the amount of process that is due is difficult in some cases.  But where, as here, the government substitutes a wholly unexplained invocation of national security for any constitutionally meaningful process, it is an easy case.  That point is illustrated by *Boumediene v. Bush*, 553 U.S. 723 (2008), *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004), and this Court's cases determining the process due to entities designated as foreign terrorist organizations (FTOs).  *See In re People's Mojahedin Org. of Iran*, 680 F.3d 832, 836 (D.C. Cir. 2012) (*PMOI IV*); *People's Mojahedin Org. of Iran v. U.S. Dep't of State*, 613 F.3d 220 (D.C. Cir. 2010) (*PMOI III*); *Kahane Chai v. Dep't of State*, 466 F.3d 125 (D.C. Cir. 2006); *Nat'l*

*Council of Resistance of Iran v. Dep't of State*, 251 F.3d 192 (D.C. Cir. 2001) (*NCRI I*).  These precedents confirm the due process violation here.

### 1.  The Private Interests Infringed by the Presidential Order Are Significant.

The presidential order eviscerated a host of important property and liberty interests possessed by Ralls.  It prohibited Ralls's transaction with Terna; required Ralls to divest the property it purchased; forced Ralls to destroy all tangible items it had constructed; barred Ralls from selling turbines in its possession; and excluded Ralls from accessing its own property.  These are all "highly important property interest[s]," *NCRI I*, 251 F.3d at 206, and are central to Ralls's business model and corporate purpose—the acquisition and development of domestic windfarms to demonstrate to the American market the reliability of the turbines it uses.

Ralls's property and liberty interests are considerably stronger than those accepted in many other due process cases arising in the national security context.  First, unlike a group designated as an FTO—which by definition must be a "foreign organization," 8 U.S.C. § 1189(a)(1)(A)—Ralls is an American company, chartered in Delaware and headquartered in Georgia, that does business in this country.  Ralls is thus entitled to the same due process protections available to any other U.S. company or citizen.

Second, Ralls's property is considerably more valuable than that at issue in other national security cases where due process violations were found. In *NCRI I*, for example, the property was a "small bank account" owned by a designated FTO and frozen by the Secretary of State. *NCRI I*, 251 F.3d at 201. The value of that property pales in comparison to the value of the four Project Companies, to say nothing of the constructed items Ralls was forced to destroy, the turbines it was precluded from selling, and the property it was prohibited from accessing. *See* Ex. C to Brief in Supp. of Mot. for TRO and Prelim. Inj. § 2.2, *Ralls Corp. v. Terna Energy USA Holding Corp.*, No. 13-739 (S.D.N.Y. Feb. 8, 2013) (Dkt. 16) (valuing Ralls-Terna transaction at $6 million). If the freezing of a "small" sum of money supports the finding of a due process violation, all the more so do the large-scale property deprivations caused by the presidential order.[6]

### 2. The Government's Denial of Notice and Opportunity for Rebuttal Presents a Severe Risk of Erroneous Deprivation.

The essence of due process is that the government may not deprive someone of protected interests without providing "notice of the factual basis" for the deprivation and "a fair opportunity for rebuttal." *Wilkinson v. Austin*, 545 U.S.

---

[6] The district court stated that the property interests at stake here are "much less compelling" than in *Hamdi*, which involved "an individual's liberty interest in freedom from bodily detention." JA-165. But Ralls has never argued otherwise, and in all events that does not mean that *Hamdi* simply has no applicability here, as the district court seemed to believe. Moreover, Ralls's property and liberty interests are clearly greater than the interests in *NCRI I* as to which a due process violation was found.

209, 209, 211 (2005); *see also* Henry J. Friendly, *Some Kind of Hearing*, 123 U. Pa. L. Rev. 1267, 1280-81 (1975) ("It is likewise fundamental that notice … clearly inform the individual of the proposed action and the ground for it. Otherwise the individual likely would be unable to marshal evidence and prepare his case so as to benefit from any hearing that was provided."), *quoted in Gray Panthers v. Schweiker*, 716 F.2d 23, 32 (D.C. Cir. 1983). Neither CFIUS nor the President, however, afforded Ralls *any* notice of the grounds for the government's actions or *any* opportunity to refute those grounds.

Indeed, Ralls did not even receive the amount of process this Court has found to be inadequate in the FTO cases. In those cases, this Court has held that even an entity facing an FTO designation is entitled to two critical procedural safeguards. First, the government must articulate the factual basis for its action; in particular, it must provide the unclassified materials that give rise to its concerns. *See PMOI III*, 613 F.3d at 227; *Kahane Chai*, 466 F.3d at 132; *NCRI I*, 251 F.3d at 209; *see also Hamdi*, 542 U.S. at 533 (plurality) (citizen "must receive notice of the factual basis" for designation as enemy combatant); *Boumediene*, 553 U.S. at 783-84 (combatant must "be aware of the most critical allegations that the Government relied upon to order his detention"). Second, the entity must have an opportunity *both* to present its affirmative case that it should not be designated *and* to rebut the government's case against it. *See PMOI III*, 613 F.3d at 227; *Kahane*

35

*Chai*, 466 F.3d at 132; *NCRI I*, 251 F.3d at 209; *Holy Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156, 163 (D.C. Cir. 2003) (same requirement for Specially Designated Global Terrorists); *see also Boumediene*, 553 U.S. at 783 (criticizing "constraints upon the detainee's ability to rebut the factual basis for the Government's assertion that he is an enemy combatant").   Neither of those "essential constitutional promises" that underlie due process, *Hamdi*, 542 U.S. at 533 (plurality), was honored here.[7]

   *a. The Notice of Grounds Requirement.*   The government has never revealed any factual basis for the CFIUS orders or the presidential order.  The closest thing to an explanation is the unadorned assertion in the presidential order, accompanied by no evidence or articulation whatsoever, that Ralls "might take action that threatens to impair the national security."   JA-89.  But that is a conclusion, not a reason.  Indeed, it is nothing more than a verbatim parroting of Section 721.  *See* 50 U.S.C. app. § 2170(d)(4)(A).  To this day, Ralls remains entirely in the dark whether the President acted because of the potential for interference with military

---

   [7] An FTO also is entitled to an explanation of "which sources [the government] regards as sufficiently credible that [it] relies on them," and "to which part of [the governing statute] the information [it] relies on relates."   *PMOI III*, 613 F.3d at 230.  Because the government has not disclosed any information about the nature and basis of its concerns as to Ralls's transaction, it has breached these obligations as well.  Section 721 allows the President to act "only if" he finds the necessary "credible evidence," 50 U.S.C. app. § 2170(d)(4)(A), but the government has offered nary a hint as to what that supposedly credible evidence is.

flight operations, the possible presence of electronic surveillance devices, some other unspecified concern, or, as the President contemporaneously suggested on the campaign trail, simple economic protectionism. *See* Barack Obama, Remarks by the President at a Campaign Event in Davenport, Iowa (Oct. 24, 2012), http://tinyurl.com/iowaremarks ("I don't want … wind turbines manufactured in China … I want them made in the United States of America.").

Nor has Ralls been given access to any of the materials—even unclassified materials—upon which the government relied. In the FTO context, due process requires the government to disclose all "unclassified items upon which [it] proposes to rely" when designating a group. *NCRI I*, 251 F.3d at 209. Ralls was given no unclassified material. Indeed, it was given nothing at all.

The district court nevertheless brushed aside this requirement; in its view, this Court in *NCRI I* required the government to provide unclassified information not because it was a component of due process, but because "the reasons were going to be public anyway" upon judicial review. JA-169. That is a misreading of *NCRI I*. This Court repeatedly has characterized the disclosure requirement of that case not as a prudential acknowledgement of reality but as a basic obligation of due process. As the Court later said, in reference to *NCRI I*, "we have held due process requires that the [FTO] be notified of the unclassified material on which the [government] proposes to rely and an opportunity to respond to that material."

*PMOI III*, 613 F.3d at 228; *see also People's Mojahedin Org. of Iran v. Dep't of State*, 327 F.3d 1238, 1242 (D.C. Cir. 2003) (*PMOI II*) (holding that "due process required" government to give FTO notice of "the unclassified portions of the administrative record") (citing *NCRI I*, 251 F.3d at 207-09); *accord Nat'l Council of Resistance of Iran v. Dep't of State*, 373 F.3d 152, 159-60 (D.C. Cir. 2004) (*NCRI II*).[8]

This Court's FTO cases further hold that due process requires the government not only to disclose unclassified material, but also to "review[] and disclose[] all material that it believes can be safely declassified consistent with national security interests." *PMOI III*, 613 F.3d at 230 n.7; *see also PMOI IV*, 680 F.3d at 835-36. The government has undertaken no such review here.

To be clear, Ralls does not seek access to the government's classified information. But the withholding of classified information heightens the government's duty to reveal the *unclassified* bases for its action. In *PMOI III*, this Court explained that the government "ha[d] not relied critically on classified material and the unclassified material provided to the FTO [was] sufficient to

---

[8] Curiously, the district court asserted that the *PMOI III* opinion "is not a statement about what due process requires generally." JA-170. That may come as a surprise to the *PMOI III* Court, which devoted some four pages of its opinion to a discussion of the due process requirements of notice and hearing before concluding that the government "failed to accord the PMOI the due process protections outlined in our previous decisions." 613 F.3d at 222, 227-30.

justify the designation."  613 F.3d at 231.  The Court stressed, however, that "none of the [FTO] cases decides whether an administrative decision relying critically on undisclosed classified material would comport with due process because in none was the classified record essential to uphold an FTO designation."  *Id*. at 231; *see also Kahane Chai*, 466 F.3d at 129.

        *b. The Opportunity for Rebuttal Requirement.*  Ralls also never received the most important element of due process:  a meaningful opportunity to rebut the basis for the government's deprivation.  *See Wilkinson*, 545 U.S. at 209, 211 (due process requires "notice of the factual basis" for the government's action and "a fair opportunity for rebuttal").

        This requirement obtains even in the national security context.  In *Hamdi*, the Court held that "[a]ny process in which the Executive's factual assertions go wholly unchallenged or are simply presumed correct without any opportunity … to demonstrate otherwise falls constitutionally short."  542 U.S. at 537 (plurality); *see also Boumediene*, 553 U.S. at 783 (criticizing "constraints upon the detainee's ability to rebut the factual basis for the Government's assertion that he is an enemy combatant"); *Greene v. McElroy*, 360 U.S. 474, 496 (1959) ("[T]he evidence used to prove the Government's case [for revocation of security clearance] must be disclosed to the individual so that he has an opportunity to show that it is untrue."); *PMOI III*, 613 F.3d at 230 (due process bars government from designating an FTO

unless it first "give[s] the [group] an opportunity to rebut the unclassified material on which [it] relies").

The district court concluded that, because Ralls was allowed to make a submission to CFIUS and to have one meeting with CFIUS staff, due process was satisfied since Ralls "was afforded an opportunity to present all of the reasons why it believed its involvement in the Project Companies did not pose a threat to the national security." JA-165-166. But a party in Ralls's shoes must be allowed to *refute* the government's allegations and address the government's specific concerns, not just present an affirmative case that it is not a threat. In *PMOI III*, for example, even though the group was "given the opportunity to include in the record its own evidence supporting delisting," this Court found a due process violation because the group "had no opportunity to rebut the unclassified portion of the record the Secretary was compiling." 613 F.3d at 227; *see also PMOI IV*, 680 F.3d at 833 (group entitled to "review and rebut" government's evidence); *Kahane Chai*, 466 F.3d at 132 (group entitled to "rebut" government's evidence).

Since the government never informed Ralls of the allegations against it, Ralls had no opportunity to rebut those secret allegations. Ralls could only guess at the reasons it stood accused, rather than contest the government's actual reasons. Neither the voluntary notice that Ralls submitted to CFIUS nor the single meeting with CFIUS staff provided Ralls an opportunity for rebuttal. During the meeting,

40

CFIUS staff did not reveal anything about its concerns, much less permit Ralls an opportunity to respond to them.

The government's persistent refusal to articulate any concern beyond a naked invocation of "national security" prevented Ralls from tailoring its submissions to address CFIUS's and the President's concerns (whatever they are). Ralls could not correct any factual inaccuracies—it does not know what facts worry the government.  And it was unable to propose mitigation measures that could have assuaged the government's worries.  Because the government kept its concerns and their factual basis to itself, Ralls had no opportunity to prepare a submission tailored to those concerns that could have "affect[ed] the [government's] view not only of [the unclassified] evidence but of the classified material as well."  *PMOI III*, 613 F.3d at 229 n.6.  A tailored submission might have persuaded CFIUS to change its mind, or persuaded the President to reject CFIUS's recommendation.  *Id.* at 228; *NCRI I*, 251 F.3d at 209.[9]  As it was, Ralls was left to play a guessing game with a player who gave no answers.

The district court's efforts to distinguish the FTO cases ultimately backfire. It is true that, unlike Section 721, the FTO statute "has a judicial review provision"

---

[9] These are not hypothetical scenarios; after prevailing in this Court on due process grounds, the FTO in the *PMOI* cases convinced the government to take it off the FTO list.  *See* Scott Shane, *Iranian Dissidents Convince U.S. to Drop Terror Label*, N.Y. Times (Sept. 21, 2012).

and "requires the creation of an administrative record for the purpose of that review."  JA-167.  But these differences magnify, not diminish, the due process violation Ralls has suffered.  The fact that Congress has not provided for direct judicial review of the merits of CFIUS or presidential orders makes it even more important for the government to offer robust administrative process in connection with such mandates.  Judicial review is not an adequate substitute for meaningful process before the government decisionmaker.  *See*, *e.g.*, *PMOI III*, 613 F.3d at 227 ("[O]ur review 'is not sufficient to supply the otherwise absent due process protection' of notice to the designated organization and an opportunity for meaningful hearing."  (quoting *NCRI I*, 251 F.3d at 208)).

The district court also quoted this Court's observation that the FTO statute is "unique."  JA-167 (quoting *People's Mojahedin Org. of Iran v. U.S. Dep't of State*, 182 F.3d 17, 19 (D.C. Cir. 1999) (*PMOI I*)).  But what this Court found "unique" about the FTO statute was "the dearth of procedural participation and protection afforded the designated entity," including the absence of a right to "notice of the materials used against it, or a right to comment on such materials."  *NCRI I*, 251 F.3d at 196.  Those are, of course, the same procedural deficiencies that Ralls challenges here.

### 3.    A Wholly Unexplained Assertion of National Security Does Not Satisfy Due Process.

The district court accepted the government's interest asserted here—national security—without requiring the government to explain to it (much less to Ralls), what possible threat Ralls's purchase of the Project Companies posed to the nation. Nor did the court require the government to present any evidence in support of its asserted interest.  Instead, the district court fell back on the fact that Section 721 "expressly bars the courts from reviewing the actions and findings of the President."  JA-166.  The court apparently forgot its prior (and correct) holding that Section 721 does not bar judicial review of Ralls's due process claim against the President.  JA-131-133.  In any event, Section 721 cannot, of course, send the Due Process Clause on holiday.

National security needs do not give the government *carte blanche* to suspend the fundamental due process requirements of notice and opportunity to be heard. *See*, *e.g.*, *Hamdi*, 542 U.S. at 532-33 (plurality).  No governmental interest is more compelling than national security, *see Haig v. Agee*, 453 U.S. 280, 307 (1981), but not even "a state of war" is "a blank check for the President," *Hamdi*, 542 U.S. at 536 (plurality).  The Executive "is certainly not immune from the historic requirement of fairness merely because he acts, however conscientiously, in the name of security."  *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 173 (1951) (Frankfurter, J., concurring).  The *Hamdi* Court held that national

43

security did not obviate the need for the government to provide notice of the factual bases for detention and an opportunity for rebuttal to a person captured on a "foreign battlefield" with a "Taliban military unit" and armed with a "'Kalashnikov assault rifle.'" 542 U.S. at 512-13, 524; *see also Boumediene*, 553 U.S. at 783 (addressing "the Executive's battlefield determination that the detainee is an enemy combatant"). If an enemy combatant captured overseas has a right to notice and rebuttal, certainly Ralls deserves at least as much process.

Indeed, even the government's stated interest in national security is much weaker here than in the enemy combatant and FTO cases. There, battlefield hostilities were ongoing, and actual terrorist activity was alleged. Nothing of the sort exists here. The presidential order finds only that there "is credible evidence that leads [the President] to *believe*" that Ralls "*might* take action that *threatens* to impair the national security of the United States." JA-89 (emphases added); *cf.* 50 U.S.C. app. § 2170(d)(4)(A). But a belief that someone *might* do something that *may* harm national security, based on unrevealed evidence, cannot justify dispensing with the very fundamentals of due process—especially when it has been held that *actual* national security harms do not. And because the government's articulation of its interest merely parrots the words of Section 721, it is nigh-impossible to judge whether its interests are strong or weak. But the proper response cannot be simply to take the government's word for it.

44

Moreover, requiring the government to inform Ralls of the nature of its concerns and provide some—any—evidentiary basis for them will not unduly interfere with the government's interests.  The government routinely discloses this kind of information in the wake of this Court's FTO decisions, and there is no reason to think that the government's decisionmaking has been crippled as a result.

To be clear, Ralls is not asking the courts to second-guess the President's findings regarding the needs of national security.  Ralls is only asking the Executive Branch to employ constitutionally adequate *procedures* before it deprives Ralls of its property and liberty—*i.e.*, some articulation of the grounds for the government's action and an opportunity to address and rebut those grounds.  In contrast, in the FTO cases, groups have challenged the government's substantive determination that they engaged in terrorism or had the means and intent to do so, *e.g.*, *NCRI II*, 373 F.3d at 156-59; *PMOI II*, 327 F.3d at 1243-44; *PMOI I*, 182 F.3d at 24-25, and in the enemy combatant cases, detainees have challenged the substantive determination that they fought with or supported enemy forces, *e.g.*, *Al-Bihani v. Obama*, 594 F. Supp. 2d 35, 38-39 (D.D.C. 2009).  If national security interests do not bar judicial scrutiny of such substantive determinations, then surely the courts may pass judgment on the (in)adequacy of the procedures used here.

In sum, the presidential order was issued "without disclosure of any reasons justifying it, [and] without opportunity to meet the undisclosed evidence or

45

suspicion on which [it] may have been based." *Joint Anti-Fascist Refugee Comm.*, 341 U.S. at 161 (Frankfurter, J., concurring). In other words, it was issued without due process of law. Even in the national security context, due process requires notice of the grounds for the government's action and an opportunity to rebut those grounds. Ralls received neither.

## II.    RALLS'S CHALLENGE TO THE CFIUS ORDERS IS NOT MOOT BECAUSE CFIUS'S ACTIONS ARE CAPABABLE OF REPETITION YET EVADE REVIEW.

Ralls's amended complaint seeks declaratory relief as to not only the presidential order but also the CFIUS orders that preceded it. The CFIUS orders, which imposed a litany of substantial restrictions upon Ralls's property and liberty interests, violated both due process and the APA. The district court, however, ruled that Ralls's challenge to CFIUS's actions was moot because the presidential order "revoked" CFIUS's orders. But Ralls's challenge falls squarely within the "capable of repetition, yet evading review" exception, which provides that a challenge is not moot where "(1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again." *Turner v. Rogers*, 131 S. Ct. 2507, 2514-15 (2011) (brackets omitted). These requirements are satisfied here. The district court's contrary conclusion is wrong.

46

## A.    CFIUS Orders Expire Before They Can Be Fully Litigated.

Below, the government did not dispute that Ralls satisfied the first component of the "capable of repetition" doctrine.  For good reason:  this Court has squarely held that "agency actions which tend to expire within two years are too fleeting to be litigated fully."  *Performance Coal Co. v. Fed. Mine Safety & Health Review Comm'n*, 642 F.3d 234, 238 (D.C. Cir. 2011); *see Burlington N. R.R. v. Surface Transp. Bd.*, 75 F.3d 685, 690 (D.C. Cir. 1996) ("[B]oth Supreme Court and circuit precedent hold that orders of less than two years' duration ordinarily evade review.").

CFIUS has the authority to "enter into or impose, and enforce any agreement or condition" with a party to a covered transaction, 50 U.S.C. app. § 2170(*l*)(1)(A), but it may only do so during its initial 30-day review period, the following 45-day investigation period, or the subsequent 15-day period of the President's consideration.  *See id.* §§ 2170(b)(1)(E), 2170(b)(2)(C), 2170(d)(2) (noting time limits for each period).  CFIUS's authority terminates if it does not undertake an investigation, does not report the transaction to the President following an investigation, or reports the transaction but the President takes no action.  *See* 31 C.F.R. §§ 800.504, 800.506(d), 800.601(a)(2)-(3).  Therefore, within just 90 days of commencing a review, CFIUS will have either declined to issue an order, issued an order with which the affected party complies, or issued an order that the affected

party challenges in litigation but that expires upon the President's subsequent determination. In no sense, then, can the legality of a CFIUS order be "litigated fully" within "this court's two-year rule for short-lived agency actions." *Performance Coal*, 642 F.3d at 237; *see also Texaco, Inc. v. Dep't of Energy*, 663 F.2d 158, 164 (D.C. Cir. 1980) (challenge to interim FERC order not moot since "[b]efore this court could ever pass on [its legality], it is likely that DOE would issue a final order which superseded it"). As this case demonstrates, the maximum lifespan of a CFIUS order challenged by a party and superseded by presidential action is 90 days. Here, CFIUS issued its initial order on July 25, 2012, and the President revoked that order (along with CFIUS's August 2 amended order) just 65 days later, on September 28—too short a time for Ralls to fully litigate the CFIUS orders before the allegedly mooting event.

The district court brushed aside the two-year rule because Ralls "had an opportunity to be heard before the September 28 deadline" for expiration of the CFIUS order but "let forty-one (if not forty-two) days go by before" filing its complaint and "withdr[e]w its motion for" a TRO and preliminary injunction. JA-135. Thus, in its view, Ralls had "failed to meet [its] obligation" to "make a full attempt to prevent [its] case from becoming moot." JA-135-136 (citing *Armstrong v. FAA*, 515 F.3d 1294 (D.C. Cir. 2008), and *Newdow v. Roberts*, 603 F.3d 1002 (D.C. Cir. 2010)).

That reasoning is faulty. Having an "opportunity to be heard" before an agency order expires is not the relevant inquiry; what matters is whether the challenge can be "litigated fully" within two years. *Performance Coal*, 642 F.3d at 237; *see also Del Monte Fresh Produce Co. v. United States*, 570 F.3d 316, 322 (D.C. Cir. 2009) ("By 'evading review' the Supreme Court has meant evading Supreme Court review." (quotation marks omitted)). Indeed, this Court has rejected the notion that a party challenging short-duration agency orders must immediately commence litigation and exhaust all avenues of emergency relief or risk forfeiting an "evading review" argument. *See Washington Post v. Robinson*, 935 F.2d 282, 287 n.6 (D.C. Cir. 1991) ("[W]e have refused to make requests for expedition a prerequisite to an 'evading review' argument."); *British Caledonian Airways Ltd. v. Bond*, 665 F.2d 1153, 1158 (D.C. Cir. 1981) (rejecting argument that, "in order to seek judicial review of" short-duration agency action, plaintiff "must race to the courthouse before the [agency] takes an irreversible action"). The district court's cases, *Armstrong* and *Newdow*, do not hold to the contrary; indeed, they do not even mention the two-year rule. And the court's approach is misguided as a practical matter. It discourages pre-complaint investigation, encourages the filing of non-meritorious requests for emergency relief, and deters parties from seeking resolutions that promote judicial economy—as occurred here

49

when Ralls withdrew its TRO/PI motion after the government agreed to allow Ralls to resume some preliminary construction activities.

This Court has held under very similar circumstances that short-lived agency orders like CFIUS orders "evade review"—including in cases decided after *Armstrong* and *Newdow*. In *Del Monte*, for example, plaintiff challenged the timeliness of an agency's response to its application for a one-year export license. This Court held that because the challenge "cannot be fully litigated before the expiration, let alone the granting, of the requested license," it "meets the evading-review prong." 570 F.3d at 322. In *Honeywell International, Inc. v. NRC*, 628 F.3d 568, 576-77 (D.C. Cir. 2010), a one-year agency exemption for which plaintiff was annually required to apply satisfied the two-year rule. In *Performance Coal*, an agency order that was later superseded satisfied the two-year rule because of the "inevitability of future modification" of such orders. 642 F.3d at 237. Most recently, in *United Brotherhood of Carpenters & Joiners of America v. Operative Plasterers' & Cement Masons' International Ass'n of the United States & Canada*, 721 F.3d 678, 688 (D.C. Cir. 2013), a challenge to an arbitrator's award of union work assignments on a construction project that had since concluded satisfied the "evading review" prong; this Court noted that such projects "typically last no longer than approximately two years" and work assignments on such projects "last for even shorter periods."

Notably, in none of these cases did the plaintiffs rush to file complaints or petitions for review immediately after the challenged action, or seek emergency or expedited relief. Indeed, in *Del Monte*, as here, plaintiffs *withdrew* their request for a preliminary injunction in the district court. *See* Notice of Withdrawal of Appl. For Prelim. Inj., *Del Monte Fresh Produce Co. v. United States*, No. 07-2143 (D.D.C. Nov. 30, 2007) (Dkt. 5). That would have been fatal under the district court's approach here. But all of these cases make clear that what matters is how long it takes to obtain a final determination. In a case like this, where there is only a 90-day window to litigate—well below the two-year rule of thumb applied by this Court—the fact that litigation did not begin on day one is entirely beside the point.

## B.    There is a Reasonable Expectation that Ralls Will Be Subject to a CFIUS Order in the Future

The "capable of repetition" requirement is also satisfied here. "By 'capable of repetition' the Supreme Court … means 'a reasonable expectation that the same complaining party would be subjected to the same action again.'" *Christian Knights of Ku Klux Klan Invisible Empire, Inc. v. District of Columbia*, 972 F.2d 365, 370 (D.C. Cir. 1992) (quoting *Weinstein v. Bradford*, 423 U.S. 147, 149 (1975)). In the agency context, the "same action" refers to "particular agency policies, regulations, guidelines, or recurrent identical agency actions." *Theodore Roosevelt Conservation P'ship v. Salazar*, 661 F.3d 66, 79 (D.C. Cir. 2011). The

51

relevant inquiry is not "whether the precise historical facts that spawned the plaintiff's claims are likely to recur," but "whether the legal wrong complained of by the plaintiff is reasonably likely to recur." *Performance Coal*, 642 F.3d at 238. In short, "it is the likelihood of the plaintiff's encountering a similar problem in the future that matters." *Christian Knights*, 972 F.3d at 370.

This Court has acknowledged "the Supreme Court's instruction to apply the 'reasonable expectation' standard without excessive 'stringency.'" *Doe v. Sullivan*, 938 F.2d 1370, 1379 (D.C. Cir. 1991) (R.B. Ginsburg, J.) (quoting *Honig v. Doe*, 484 U.S. 305, 318 n.6 (1988)). "The core decision is 'whether the controversy is *capable* of repetition and not whether the claimant has demonstrated that a recurrence of the dispute is more probable than not.'" *Id.* (brackets and ellipsis omitted). It is enough "that the litigant 'faces some likelihood of becoming involved in the same controversy in the future.'" *Id.* (quoting *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 398 (1980)).

These requirements are satisfied here. As alleged in its amended complaint, Ralls exists for the purpose of identifying opportunities in the United States for the development and construction of windfarms in which turbines made by Sany will be used. JA-52. Ralls will continue to pursue such opportunities and to acquire American companies to do so, just as it acquired the Project Companies. JA-54. Every one of these "covered transactions" will be subject to CFIUS jurisdiction,

policies, regulations, and requirements. *See* 50 U.S.C. app. § 2170(a)(3); *Theodore Roosevelt*, 661 F.3d at 79. CFIUS "asserts that [it] has the legal authority" to issue mitigation orders imposing restrictions on Ralls's future transactions without adequate explanation and beyond its authority. *British Caledonian Airways*, 665 F.2d at 1158. And, while "rare," *id.*, CFIUS's history of deeming transactions by Ralls to raise national security concerns—and issuing mitigation orders restricting those transactions—demonstrates at least a reasonable expectation that CFIUS will do so again.

Accordingly, as other cases involving similar circumstances demonstrate, there is a "reasonable expectation" that Ralls will be subjected to the same CFIUS "policies, regulations, guidelines, or recurrent identical agency actions" it challenges here, thereby satisfying the "capable of repetition" requirement. *See Christian Knights*, 972 F.3d at 370 (District's denial of parade permit was "capable of repetition" where plaintiff asserted intention to conduct further marches throughout country, despite no allegation that plaintiff had "any current plans to return to Washington"); *Doe*, 938 F.3d at 1378 (military's use of investigational drugs on soldiers exposed to chemical weapons was "capable of repetition" given plaintiff's "past exposure to the threat of chemical warfare" and "his continuing status as a member of our armed forces"); *Honeywell*, 628 F.3d at 577 (requirement satisfied where plaintiff was "regulated party subject to the [agency's] licensing

requirements" and would "in the future seek [agency] approval" for exemption it was challenging); *British Caledonian Airways*, 665 F.2d at 1158 (requirement satisfied in challenge to FAA grounding order because "the FAA Administrator asserts that he has the legal authority" to issue such orders). Indeed, this Court has observed that the mootness exception is established when an agency's mere "assertion of authority … casts what may well be a substantial adverse effect on the interests of the petitioner." *Humane Soc'y of U.S. v. EPA*, 790 F.2d 106, 114 (D.C. Cir. 1986) (quotation marks omitted). That is the case here, for the only way Ralls can be assured of avoiding future CFIUS mitigation orders is to abandon its preferred business approach of purchasing existing windfarm companies.

The district court erroneously applied the "reasonable expectation" test with the "excessive stringency" that this Court has forbidden. *Doe*, 938 F.2d at 1379 (quotation marks omitted). Citing *People for the Ethical Treatment of Animals, Inc. v. Gittens*, 396 F.3d 416 (D.C. Cir. 2005) (*PETA*), the court below believed that whether Ralls would be subject to another CFIUS order was "'highly dependent upon a series of facts unlikely to be duplicated in the future.'" JA-138 (quoting 396 F.3d at 424). But *PETA* is a far different case. There, the Court explained:

> To conclude that a dispute like this would arise in the future requires us to imagine a sequence of coincidences too long to credit. The District would have to sponsor another such public arts display; it would have to call upon private parties to participate in the design of the objects, while it retained ownership of the resulting artwork; in light of the particular art, PETA would have to believe it could

> advance its cause by participating in the program; PETA would have to submit a proposed design; the Commission would have to reject it as inconsistent with Commission's criteria; at the same time, the Commission would have to approve other designs not meeting its criteria; and those non-conforming designs would have to be analogous to the design PETA submitted.

*PETA*, 396 F.3d at 424. In contrast to the convoluted, seven-step "sequence of coincidences" in *PETA*, only two entirely plausible events need occur for Ralls to be subjected to the legal wrongs it challenges: Ralls must acquire an American company—as it alleges it will do—and CFIUS must find that the acquisition raises national security concerns. That is not a tortuous chain of happenstance "too long to credit." *Id.* Rather, no less than in *Christian Knights*, *Doe*, *British Caledonian Airways*, and *Honeywell*, it is a completely foreseeable scenario based on CFIUS's mission, history, and asserted authority.[10]

The district court held that without "information about where [Ralls] intends to install its turbines or any other details about the future windfarms," it could not "conclude that it is reasonable to expect that this circumstance alone"—*i.e.*, Ralls's further acquisitions of American windfarms—"will trigger national security concerns." JA-137-138. But that reasoning only underscores the court's error and the need for review of the CFIUS action here. The gravamen of Ralls's challenge to the CFIUS orders is that *nobody* knows what "will trigger national security

---

[10] Ralls would challenge any future CFIUS orders that, like those at issue here, deprived Ralls of its property and liberty without any explanation or opportunity for rebuttal.

concerns," because CFIUS refuses to provide any explanation or evidence (even unclassified) supporting that conclusion or to allow any opportunity for rebuttal of its reasoning. As the district court itself acknowledged, "what ultimately prompted CFIUS to take action is unknown." JA-140. Ralls could provide every last detail about where it intends to purchase windfarms or install turbines, but because CFIUS is a black box, there will never be a way to ascertain what, in CFIUS's view, will raise national security concerns.

In short, the government cannot have it both ways. It cannot refuse to provide any explanation for the "national security concerns" invoked in the CFIUS orders, and yet rely on those same unidentified "concerns" to avoid the "capable of repetition" doctrine. Under that approach, which the district court endorsed, CFIUS action would always be unreviewable. When Ralls—or any covered party—is subject to another CFIUS order, it will again be unable to satisfy the "capable of repetition" prong because CFIUS will again provide no explanation for its action, thereby precluding any estimate of whether and how CFIUS might react to a future transaction. No authority supports such a parsimonious view of the "capable of repetition" test. Because Ralls has demonstrated that it faces "some likelihood of becoming involved in the same controversy in the future" against CFIUS, *Doe*, 938 F.2d at 1379, its challenge to CFIUS's actions is not moot.

56

## III. CFIUS'S ORDERS VIOLATE DUE PROCESS AND THE ADMINISTRATIVE PROCEDURE ACT.

Not only is Ralls's challenge to the CFIUS orders justiciable; Ralls has properly stated a claim that CFIUS's orders violate the Constitution and the APA. *See* 5 U.S.C. § 706(2)(A)-(B).

The orders are both unconstitutional and arbitrary and capricious. CFIUS offered no evidence or explanation for its orders aside from the vague and inadequate incantation that "there are national security risks" that arise from the Ralls-Terna transaction. And it offered no meaningful opportunity for Ralls to rebut CFIUS's (absent) reasoning. These omissions violated Ralls's right to due process for the same reasons that the presidential order violated due process. CFIUS's orders also constitute a textbook violation of the APA. "The requirement that agency action not be arbitrary or capricious includes a requirement that the agency adequately explain its result." *Pub. Citizen, Inc. v. FAA*, 988 F.2d 186, 197 (D.C. Cir. 1993). Here, CFIUS did not adequately explain its action—indeed, it gave no explanation whatsoever, just a naked invocation of "national security." In issuing its bare-bones yet far-reaching orders, CFIUS "has passed from the tolerably terse to the intolerably mute," in violation of the APA. *FEC v. Rose*, 806 F.2d 1081, 1088 n.14 (D.C. Cir. 1986) (quotation marks omitted).

CFIUS also violated the APA by exceeding its statutory jurisdiction or authority. *See* 5 U.S.C. § 706(2)(C). Section 721 limits CFIUS's oversight to

57

transactions "which could result in foreign control of any person." 50 U.S.C. app. § 2170(a)(3). Section 1(d) of the amended order, however, bars Ralls from "sell[ing] or otherwise transfer[ring] … *to any third party* for use or installation at" the windfarms "any *items* made or otherwise produced by the Sany Group." JA-86 (emphases added). This restriction is doubly beyond CFIUS's statutory ken. First, CFIUS has no authority to impose restrictions on (much less outright bar) transactions in which Ralls merely transfers "*items* made or otherwise produced by the Sany Group," because those transactions do not "result in foreign control of any *person*." *See also* 31 C.F.R. § 800.221 (defining "person" as "any individual or entity"). Second, CFIUS may not restrict transfers of items "*to any third party*," since transfers to an American recipient would not result in "*foreign* control." Section 1(e) of the amended order, which prohibits Ralls from "complet[ing] a sale or transfer of the Project Companies or their assets *to any third party*" absent CFIUS approval, JA-86 (emphasis added), fails for the same reason.

It is "fundamental" that "an agency may not bootstrap itself into an area in which it has no jurisdiction." *Adams Fruit Co. v. Barrett*, 494 U.S. 638, 650 (1990) (quotation marks omitted). Because the obligations in Sections 1(d) and 1(e) of the amended order seek to regulate transactions over which CFIUS has no authority, CFIUS has violated the APA.

58

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be reversed and the case remanded for further proceedings.

Respectfully submitted,

s/Paul D. Clement

Tim Tingkang Xia                              Paul D. Clement
MORRIS, MANNING                          Viet D. Dinh
  & MARTIN, LLP                               H. Christopher Bartolomucci
1600 Atlanta Financial Center           George W. Hicks, Jr.
3343 Peachtree Road NE                  BANCROFT PLLC
Atlanta, GA 30326                            1919 M Street NW
(404) 495-3677                                 Suite 470
                                                      Washington, DC 20036
                                                      (202) 234-0090
                                                      pclement@bancroftpllc.com

*Counsel for Appellant Ralls Corporation*

February 7, 2014

## CERTIFICATE OF COMPLIANCE
## WITH TYPE-VOLUME LIMITATION

I hereby certify that:

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(N) because it contains 13,927 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Circuit Rule 32(a)(1).

2. This Brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point font.

Dated: February 7, 2014

s/George W. Hicks, Jr.
George W. Hicks, Jr.

# Addendum

# TABLE OF CONTENTS

Section 721 of the Defense Production Act of 1950,
　　as amended, 50 U.S.C. app. § 2170 ...................................................................1a

**Section 721 of the Defense Production Act of 1950, as amended
50 U.S.C. app. § 2170**

**Authority to review certain mergers, acquisitions, and takeovers.**

(a) Definitions

For purposes of this section, the following definitions shall apply:

(1) Committee; chairperson

The terms "Committee" and "chairperson" mean the Committee on Foreign Investment in the United States and the chairperson thereof, respectively.

(2) Control

The term "control" has the meaning given to such term in regulations which the Committee shall prescribe.

(3) Covered transaction

The term "covered transaction" means any merger, acquisition, or takeover that is proposed or pending after August 23, 1988, by or with any foreign person which could result in foreign control of any person engaged in interstate commerce in the United States.

(4) Foreign government-controlled transaction

The term "foreign government-controlled transaction" means any covered transaction that could result in the control of any person engaged in interstate commerce in the United States by a foreign government or an entity controlled by or acting on behalf of a foreign government.

(5) Clarification

The term "national security" shall be construed so as to include those issues relating to "homeland security", including its application to critical infrastructure.

(6) Critical infrastructure

The term "critical infrastructure" means, subject to rules issued under this section, systems and assets, whether physical or virtual, so vital to the United States that the incapacity or destruction of such systems or assets would have a debilitating impact on national security.

(7) Critical technologies

The term "critical technologies" means critical technology, critical components, or critical technology items essential to national defense, identified pursuant to this section, subject to regulations issued at the direction of the President, in accordance with subsection (h) of this section.

(8) Lead agency

The term "lead agency" means the agency, or agencies, designated as the lead agency or agencies pursuant to subsection (k)(5) of this section for the review of a transaction.

(b) National security reviews and investigations
  (1) National security reviews
    (A) In general
      Upon receiving written notification under subparagraph (C) of any covered transaction, or pursuant to a unilateral notification initiated under subparagraph (D) with respect to any covered transaction, the President, acting through the Committee--
        (i) shall review the covered transaction to determine the effects of the transaction on the national security of the United States; and
        (ii) shall consider the factors specified in subsection (f) of this section for such purpose, as appropriate.
    (B) Control by foreign government
      If the Committee determines that the covered transaction is a foreign government-controlled transaction, the Committee shall conduct an investigation of the transaction under paragraph (2).
    (C) Written notice
        (i) In general
          Any party or parties to any covered transaction may initiate a review of the transaction under this paragraph by submitting a written notice of the transaction to the Chairperson of the Committee.
        (ii) Withdrawal of notice
          No covered transaction for which a notice was submitted under clause (i) may be withdrawn from review, unless a written request for such withdrawal is submitted to the Committee by any party to the transaction and approved by the Committee.
        (iii) Continuing discussions
          A request for withdrawal under clause (ii) shall not be construed to preclude any party to the covered transaction from continuing informal discussions with the Committee or any member thereof regarding possible resubmission for review pursuant to this paragraph.
    (D) Unilateral initiation of review
      Subject to subparagraph (F), the President or the Committee may initiate a review under subparagraph (A) of--
        (i) any covered transaction;
        (ii) any covered transaction that has previously been reviewed or investigated under this section, if any party to the transaction submitted false or misleading material information to the Committee in connection with the review or investigation or omitted material

information, including material documents, from information submitted to the Committee; or

(iii) any covered transaction that has previously been reviewed or investigated under this section, if--

(I) any party to the transaction or the entity resulting from consummation of the transaction intentionally materially breaches a mitigation agreement or condition described in subsection (l)(1)(A) of this section;

(II) such breach is certified to the Committee by the lead department or agency monitoring and enforcing such agreement or condition as an intentional material breach; and

(III) the Committee determines that there are no other remedies or enforcement tools available to address such breach.

(E) Timing

Any review under this paragraph shall be completed before the end of the 30-day period beginning on the date of the acceptance of written notice under subparagraph (C) by the chairperson, or beginning on the date of the initiation of the review in accordance with subparagraph (D), as applicable.

(F) Limit on delegation of certain authority

The authority of the Committee to initiate a review under subparagraph (D) may not be delegated to any person, other than the Deputy Secretary or an appropriate Under Secretary of the department or agency represented on the Committee.

(2) National security investigations

(A) In general

In each case described in subparagraph (B), the Committee shall immediately conduct an investigation of the effects of a covered transaction on the national security of the United States, and take any necessary actions in connection with the transaction to protect the national security of the United States.

(B) Applicability

Subparagraph (A) shall apply in each case in which--

(i) a review of a covered transaction under paragraph (1) results in a determination that--

(I) the transaction threatens to impair the national security of the United States and that threat has not been mitigated during or prior to the review of a covered transaction under paragraph (1);

(II) the transaction is a foreign government-controlled transaction; or

(III) the transaction would result in control of any critical infrastructure of or within the United States by or on behalf of any foreign person, if the Committee determines that the transaction could impair national security, and that such impairment to national security has not been mitigated by assurances provided or renewed with the approval of the Committee, as described in subsection (l) of this section, during the review period under paragraph (1); or

(ii) the lead agency recommends, and the Committee concurs, that an investigation be undertaken.

(C) Timing

Any investigation under subparagraph (A) shall be completed before the end of the 45-day period beginning on the date on which the investigation commenced.

(D) Exception

(i) In general

Notwithstanding subparagraph (B)(i), an investigation of a foreign government-controlled transaction described in subclause (II) of subparagraph (B)(i) or a transaction involving critical infrastructure described in subclause (III) of subparagraph (B)(i) shall not be required under this paragraph, if the Secretary of the Treasury and the head of the lead agency jointly determine, on the basis of the review of the transaction under paragraph (1), that the transaction will not impair the national security of the United States.

(ii) Nondelegation

The authority of the Secretary or the head of an agency referred to in clause (i) may not be delegated to any person, other than the Deputy Secretary of the Treasury or the deputy head (or the equivalent thereof) of the lead agency, respectively.

(E) Guidance on certain transactions with national security implications

The Chairperson shall, not later than 180 days after the effective date of the Foreign Investment and National Security Act of 2007, publish in the Federal Register guidance on the types of transactions that the Committee has reviewed and that have presented national security considerations, including transactions that may constitute covered transactions that would result in control of critical infrastructure relating to United States national security by a foreign government or an entity controlled by or acting on behalf of a foreign government.

4a

(3) Certifications to Congress
    (A) Certified notice at completion of review
        Upon completion of a review under subsection (b) of this section that concludes action under this section, the chairperson and the head of the lead agency shall transmit a certified notice to the members of Congress specified in subparagraph (C)(iii).
    (B) Certified report at completion of investigation
        As soon as is practicable after completion of an investigation under subsection (b) of this section that concludes action under this section, the chairperson and the head of the lead agency shall transmit to the members of Congress specified in subparagraph (C)(iii) a certified written report (consistent with the requirements of subsection (c) of this section) on the results of the investigation, unless the matter under investigation has been sent to the President for decision.
    (C) Certification procedures
        (i) In general
           Each certified notice and report required under subparagraphs (A) and (B), respectively, shall be submitted to the members of Congress specified in clause (iii), and shall include--
               (I) a description of the actions taken by the Committee with respect to the transaction; and
               (II) identification of the determinative factors considered under subsection (f) of this section.
        (ii) Content of certification
           Each certified notice and report required under subparagraphs (A) and (B), respectively, shall be signed by the chairperson and the head of the lead agency, and shall state that, in the determination of the Committee, there are no unresolved national security concerns with the transaction that is the subject of the notice or report.
        (iii) Members of Congress
           Each certified notice and report required under subparagraphs (A) and (B), respectively, shall be transmitted--
               (I) to the Majority Leader and the Minority Leader of the Senate;
               (II) to the chair and ranking member of the Committee on Banking, Housing, and Urban Affairs of the Senate and of any committee of the Senate having oversight over the lead agency;
               (III) to the Speaker and the Minority Leader of the House of Representatives;
               (IV) to the chair and ranking member of the Committee on Financial Services of the House of Representatives and of any

committee of the House of Representatives having oversight over the lead agency; and

(V) with respect to covered transactions involving critical infrastructure, to the members of the Senate from the State in which the principal place of business of the acquired United States person is located, and the member from the Congressional District in which such principal place of business is located.

(iv) Signatures; limit on delegation

(I) In general

Each certified notice and report required under subparagraphs (A) and (B), respectively, shall be signed by the chairperson and the head of the lead agency, which signature requirement may only be delegated in accordance with subclause (II).

(II) Limitation on delegation of certifications

The chairperson and the head of the lead agency may delegate the signature requirement under subclause (I)--

(aa) only to an appropriate employee of the Department of the Treasury (in the case of the Secretary of the Treasury) or to an appropriate employee of the lead agency (in the case of the lead agency) who was appointed by the President, by and with the advice and consent of the Senate, with respect to any notice provided under paragraph (1) following the completion of a review under this section; or

(bb) only to a Deputy Secretary of the Treasury (in the case of the Secretary of the Treasury) or a person serving in the Deputy position or the equivalent thereof at the lead agency (in the case of the lead agency), with respect to any report provided under subparagraph (B) following an investigation under this section.

(4) Analysis by Director of National Intelligence

(A) In general

The Director of National Intelligence shall expeditiously carry out a thorough analysis of any threat to the national security of the United States posed by any covered transaction. The Director of National Intelligence shall also seek and incorporate the views of all affected or appropriate intelligence agencies with respect to the transaction.

(B) Timing

The analysis required under subparagraph (A) shall be provided by the Director of National Intelligence to the Committee not later than 20 days after the date on which notice of the transaction is accepted by the

Committee under paragraph (1)(C), but such analysis may be supplemented or amended, as the Director considers necessary or appropriate, or upon a request for additional information by the Committee. The Director may begin the analysis at any time prior to acceptance of the notice, in accordance with otherwise applicable law.

(C) Interaction with intelligence community

The Director of National Intelligence shall ensure that the intelligence community remains engaged in the collection, analysis, and dissemination to the Committee of any additional relevant information that may become available during the course of any investigation conducted under subsection (b) of this section with respect to a transaction.

(D) Independent role of Director

The Director of National Intelligence shall be a nonvoting, ex officio member of the Committee, and shall be provided with all notices received by the Committee under paragraph (1)(C) regarding covered transactions, but shall serve no policy role on the Committee, other than to provide analysis under subparagraphs (A) and (C) in connection with a covered transaction.

(5) Submission of additional information

No provision of this subsection shall be construed as prohibiting any party to a covered transaction from submitting additional information concerning the transaction, including any proposed restructuring of the transaction or any modifications to any agreements in connection with the transaction, while any review or investigation of the transaction is ongoing.

(6) Notice of results to parties

The Committee shall notify the parties to a covered transaction of the results of a review or investigation under this section, promptly upon completion of all action under this section.

(7) Regulations

Regulations prescribed under this section shall include standard procedures for--

(A) submitting any notice of a covered transaction to the Committee;

(B) submitting a request to withdraw a covered transaction from review;

(C) resubmitting a notice of a covered transaction that was previously withdrawn from review; and

(D) providing notice of the results of a review or investigation to the parties to the covered transaction, upon completion of all action under this section.

7a

(c) Confidentiality of information

Any information or documentary material filed with the President or the President's designee pursuant to this section shall be exempt from disclosure under section 552 of title 5, United States Code [5 U.S.C.A. § 552], and no such information or documentary material may be made public, except as may be relevant to any administrative or judicial action or proceeding. Nothing in this subsection shall be construed to prevent disclosure to either House of Congress or to any duly authorized committee or subcommittee of the Congress.

(d) Action by the President

(1) In general

Subject to paragraph (4), the President may take such action for such time as the President considers appropriate to suspend or prohibit any covered transaction that threatens to impair the national security of the United States.

(2) Announcement by the President

The President shall announce the decision on whether or not to take action pursuant to paragraph (1) not later than 15 days after the date on which an investigation described in subsection (b) of this section is completed.

(3) Enforcement

The President may direct the Attorney General of the United States to seek appropriate relief, including divestment relief, in the district courts of the United States, in order to implement and enforce this subsection.

(4) Findings of the President

The President may exercise the authority conferred by paragraph (1), only if the President finds that--

(A) there is credible evidence that leads the President to believe that the foreign interest exercising control might take action that threatens to impair the national security; and

(B) provisions of law, other than this section and the International Emergency Economic Powers Act, do not, in the judgment of the President, provide adequate and appropriate authority for the President to protect the national security in the matter before the President.

(5) Factors to be considered

For purposes of determining whether to take action under paragraph (1), the President shall consider, among other factors each of the factors described in subsection (f) of this section, as appropriate.

(e) Actions and findings nonreviewable

The actions of the President under paragraph (1) of subsection (d) of this section and the findings of the President under paragraph (4) of subsection (d) of this section shall not be subject to judicial review.

(f) Factors to be considered

For purposes of this section, the President or the President's designee may, taking into account the requirements of national security, consider--

(1) domestic production needed for projected national defense requirements,

(2) the capability and capacity of domestic industries to meet national defense requirements, including the availability of human resources, products, technology, materials, and other supplies and services,

(3) the control of domestic industries and commercial activity by foreign citizens as it affects the capability and capacity of the United States to meet the requirements of national security,

(4) the potential effects of the proposed or pending transaction on sales of military goods, equipment, or technology to any country--

(A) identified by the Secretary of State--

(i) under section 6(j) of the Export Administration Act of 1979 [section 2405(j) of this Appendix], as a country that supports terrorism;

(ii) under section 6(l) of the Export Administration Act of 1979 [section 2405(l) of this Appendix], as a country of concern regarding missile proliferation; or

(iii) under section 6(m) of the Export Administration Act of 1979 [section 2405(m) of this Appendix], as a country of concern regarding the proliferation of chemical and biological weapons;

(B) identified by the Secretary of Defense as posing a potential regional military threat to the interests of the United States; or

(C) listed under section 309(c) of the Nuclear Non-Proliferation Act of 1978 on the "Nuclear Non-Proliferation-Special Country List" (15 C.F.R. Part 778, Supplement No. 4) or any successor list;

(5) the potential effects of the proposed or pending transaction on United States international technological leadership in areas affecting United States national security;

(6) the potential national security-related effects on United States critical infrastructure, including major energy assets;

(7) the potential national security-related effects on United States critical technologies;

(8) whether the covered transaction is a foreign government-controlled transaction, as determined under subsection (b)(1)(B) of this section;

(9) as appropriate, and particularly with respect to transactions requiring an investigation under subsection (b)(1)(B) of this section, a review of the current assessment of--

(A) the adherence of the subject country to nonproliferation control regimes, including treaties and multilateral supply guidelines, which shall draw on, but not be limited to, the annual report on "Adherence to and Compliance with Arms Control, Nonproliferation and Disarmament Agreements and Commitments" required by section 2593a of Title 22;

(B) the relationship of such country with the United States, specifically on its record on cooperating in counter-terrorism efforts, which shall draw on, but not be limited to, the report of the President to Congress under section 7120 of the Intelligence Reform and Terrorism Prevention Act of 2004; and

(C) the potential for transshipment or diversion of technologies with military applications, including an analysis of national export control laws and regulations;

(10) the long-term projection of United States requirements for sources of energy and other critical resources and material; and

(11) such other factors as the President or the Committee may determine to be appropriate, generally or in connection with a specific review or investigation.

(g) Additional information to Congress; confidentiality

(1) Briefing requirement on request

The Committee shall, upon request from any Member of Congress specified in subsection (b)(3)(C)(iii) of this section, promptly provide briefings on a covered transaction for which all action has concluded under this section, or on compliance with a mitigation agreement or condition imposed in respect to such transaction, on a classified basis, if deemed necessary by the sensitivity of the information. Briefings under this paragraph may be provided to the congressional staff of such a Member of Congress having appropriate security clearance.

(2) Application of confidentiality provisions

(A) In general

The disclosure of information under this subsection shall be consistent with the requirements of subsection (c) of this section. Members of Congress and staff of either House of Congress or any committee of Congress, shall be subject to the same limitations on disclosure of information as are applicable under subsection (c) of this section.

(B) Proprietary information

Proprietary information which can be associated with a particular party to a covered transaction shall be furnished in accordance with subparagraph (A) only to a committee of Congress, and only when the committee provides assurances of confidentiality, unless such party otherwise consents in writing to such disclosure.

10a

(h) Regulations

    (1) In general

    The President shall direct, subject to notice and comment, the issuance of regulations to carry out this section.

    (2) Effective date

    Regulations issued under this section shall become effective not later than 180 days after the effective date of the Foreign Investment and National Security Act of 2007.

    (3) Content

    Regulations issued under this subsection shall--

        (A) provide for the imposition of civil penalties for any violation of this section, including any mitigation agreement entered into or conditions imposed pursuant to subsection (l) of this section;

        (B) to the extent possible--

            (i) minimize paperwork burdens; and

            (ii) coordinate reporting requirements under this section with reporting requirements under any other provision of Federal law; and

        (C) provide for an appropriate role for the Secretary of Labor with respect to mitigation agreements.

(i) Effect on other law

No provision of this section shall be construed as altering or affecting any other authority, process, regulation, investigation, enforcement measure, or review provided by or established under any other provision of Federal law, including the International Emergency Economic Powers Act, or any other authority of the President or the Congress under the Constitution of the United States.

(j) Technology risk assessments

In any case in which an assessment of the risk of diversion of defense critical technology is performed by a designee of the President, a copy of such assessment shall be provided to any other designee of the President responsible for reviewing or investigating a merger, acquisition, or takeover under this section.

(k) Committee on Foreign Investment in the United States

    (1) Establishment

    The Committee on Foreign Investment in the United States, established pursuant to Executive Order No. 11858, shall be a multi agency committee to carry out this section and such other assignments as the President may designate.

    (2) Membership

    The Committee shall be comprised of the following members or the designee of any such member:

(A) The Secretary of the Treasury.
(B) The Secretary of Homeland Security.
(C) The Secretary of Commerce.
(D) The Secretary of Defense.
(E) The Secretary of State.
(F) The Attorney General of the United States.
(G) The Secretary of Energy.
(H) The Secretary of Labor (nonvoting, ex officio).
(I) The Director of National Intelligence (nonvoting, ex officio).
(J) The heads of any other executive department, agency, or office, as the President determines appropriate, generally or on a case-by-case basis.

(3) Chairperson

The Secretary of the Treasury shall serve as the chairperson of the Committee.

(4) Assistant Secretary for the Department of the Treasury

There shall be established an additional position of Assistant Secretary of the Treasury, who shall be appointed by the President, by and with the advice and consent of the Senate. The Assistant Secretary appointed under this paragraph shall report directly to the Undersecretary of the Treasury for International Affairs. The duties of the Assistant Secretary shall include duties related to the Committee on Foreign Investment in the United States, as delegated by the Secretary of the Treasury under this section.

(5) Designation of lead agency

The Secretary of the Treasury shall designate, as appropriate, a member or members of the Committee to be the lead agency or agencies on behalf of the Committee--

(A) for each covered transaction, and for negotiating any mitigation agreements or other conditions necessary to protect national security; and
(B) for all matters related to the monitoring of the completed transaction, to ensure compliance with such agreements or conditions and with this section.

(6) Other members

The chairperson shall consult with the heads of such other Federal departments, agencies, and independent establishments in any review or investigation under subsection (a) of this section, as the chairperson determines to be appropriate, on the basis of the facts and circumstances of the covered transaction under review or investigation (or the designee of any such department or agency head).

(7) Meetings

The Committee shall meet upon the direction of the President or upon the call of the chairperson, without regard to section 552b of Title 5 (if otherwise applicable).

(l) Mitigation, tracking, and postconsummation monitoring and enforcement

(1) Mitigation

(A) In general

The Committee or a lead agency may, on behalf of the Committee, negotiate, enter into or impose, and enforce any agreement or condition with any party to the covered transaction in order to mitigate any threat to the national security of the United States that arises as a result of the covered transaction.

(B) Risk-based analysis required

Any agreement entered into or condition imposed under subparagraph (A) shall be based on a risk-based analysis, conducted by the Committee, of the threat to national security of the covered transaction.

(2) Tracking authority for withdrawn notices

(A) In general

If any written notice of a covered transaction that was submitted to the Committee under this section is withdrawn before any review or investigation by the Committee under subsection (b) of this section is completed, the Committee shall establish, as appropriate--

(i) interim protections to address specific concerns with such transaction that have been raised in connection with any such review or investigation pending any resubmission of any written notice under this section with respect to such transaction and further action by the President under this section;

(ii) specific time frames for resubmitting any such written notice; and

(iii) a process for tracking any actions that may be taken by any party to the transaction, in connection with the transaction, before the notice referred to in clause (ii) is resubmitted.

(B) Designation of agency

The lead agency, other than any entity of the intelligence community (as defined in the National Security Act of 1947), shall, on behalf of the Committee, ensure that the requirements of subparagraph (A) with respect to any covered transaction that is subject to such subparagraph are met.

(3) Negotiation, modification, monitoring, and enforcement
    (A) Designation of lead agency
        The lead agency shall negotiate, modify, monitor, and enforce, on behalf of the Committee, any agreement entered into or condition imposed under paragraph (1) with respect to a covered transaction, based on the expertise with and knowledge of the issues related to such transaction on the part of the designated department or agency. Nothing in this paragraph shall prohibit other departments or agencies in assisting the lead agency in carrying out the purposes of this paragraph.
    (B) Reporting by designated agency
        (i) Modification reports
            The lead agency in connection with any agreement entered into or condition imposed with respect to a covered transaction shall--
                (I) provide periodic reports to the Committee on any material modification to any such agreement or condition imposed with respect to the transaction; and
                (II) ensure that any material modification to any such agreement or condition is reported to the Director of National Intelligence, the Attorney General of the United States, and any other Federal department or agency that may have a material interest in such modification.
        (ii) Compliance
            The Committee shall develop and agree upon methods for evaluating compliance with any agreement entered into or condition imposed with respect to a covered transaction that will allow the Committee to adequately assure compliance, without--
                (I) unnecessarily diverting Committee resources from assessing any new covered transaction for which a written notice has been filed pursuant to subsection (b)(1)(C) of this section, and if necessary, reaching a mitigation agreement with or imposing a condition on a party to such covered transaction or any covered transaction for which a review has been reopened for any reason; or
                (II) placing unnecessary burdens on a party to a covered transaction.
(m) Annual report to Congress
    (1) In general
        The chairperson shall transmit a report to the chairman and ranking member of the committee of jurisdiction in the Senate and the House of Representatives, before July 31 of each year on all of the reviews and

investigations of covered transactions completed under subsection (b) of this section during the 12-month period covered by the report.

(2) Contents of report relating to covered transactions

The annual report under paragraph (1) shall contain the following information, with respect to each covered transaction, for the reporting period:

(A) A list of all notices filed and all reviews or investigations completed during the period, with basic information on each party to the transaction, the nature of the business activities or products of all pertinent persons, along with information about any withdrawal from the process, and any decision or action by the President under this section.

(B) Specific, cumulative, and, as appropriate, trend information on the numbers of filings, investigations, withdrawals, and decisions or actions by the President under this section.

(C) Cumulative and, as appropriate, trend information on the business sectors involved in the filings which have been made, and the countries from which the investments have originated.

(D) Information on whether companies that withdrew notices to the Committee in accordance with subsection (b)(1)(C)(ii) of this section have later refiled such notices, or, alternatively, abandoned the transaction.

(E) The types of security arrangements and conditions the Committee has used to mitigate national security concerns about a transaction, including a discussion of the methods that the Committee and any lead agency are using to determine compliance with such arrangements or conditions.

(F) A detailed discussion of all perceived adverse effects of covered transactions on the national security or critical infrastructure of the United States that the Committee will take into account in its deliberations during the period before delivery of the next report, to the extent possible.

(3) Contents of report relating to critical technologies

(A) In general

In order to assist Congress in its oversight responsibilities with respect to this section, the President and such agencies as the President shall designate shall include in the annual report submitted under paragraph (1)--

(i) an evaluation of whether there is credible evidence of a coordinated strategy by 1 or more countries or companies to acquire United States companies involved in research, development, or

15a

production of critical technologies for which the United States is a leading producer; and

(ii) an evaluation of whether there are industrial espionage activities directed or directly assisted by foreign governments against private United States companies aimed at obtaining commercial secrets related to critical technologies.

(B) Release of unclassified study

All appropriate portions of the annual report under paragraph (1) may be classified. An unclassified version of the report, as appropriate, consistent with safeguarding national security and privacy, shall be made available to the public.

(n) Certification of notices and assurances

Each notice, and any followup information, submitted under this section and regulations prescribed under this section to the President or the Committee by a party to a covered transaction, and any information submitted by any such party in connection with any action for which a report is required pursuant to paragraph (3)(B) of subsection (l) of this section, with respect to the implementation of any mitigation agreement or condition described in paragraph (1)(A) of subsection (l) of this section, or any material change in circumstances, shall be accompanied by a written statement by the chief executive officer or the designee of the person required to submit such notice or information certifying that, to the best of the knowledge and belief of that person--

(1) the notice or information submitted fully complies with the requirements of this section or such regulation, agreement, or condition; and

(2) the notice or information is accurate and complete in all material respects.

## CERTIFICATE OF SERVICE

I hereby certify that on February 7, 2014, I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system, thereby serving all persons required to be served.

s/GEORGE W. HICKS, JR.
GEORGE W. HICKS, JR.
